Cleared for public filing
by the CSO, 6/30/2008

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MOHAMMED SULAYMON BARRE<br>    Detainee,<br>    United States Naval Station at<br>    Guantánamo Bay, Cuba, | ) ) ) ) | |
| | ) | |
| *Petitioner/Plaintiff,* | ) ) | **PETITION OF UN MANDATE**<br>**REFUGEE FOR WRIT OF** |
| v. | ) ) | **HABEAS CORPUS AND**<br>**OTHER RELIEF** |
| GEORGE W. BUSH,<br>    President of the United States<br>    The White House<br>    1600 Pennsylvania Ave., N.W.<br>    Washington, D.C. 20500; | ) ) ) ) ) ) | No. _____ |
| | ) | |
| ROBERT M. GATES,<br>    Secretary, United States<br>    Department of Defense<br>    1000 Defense Pentagon<br>    Washington, D.C. 20301-1000; | ) ) ) ) ) | |
| | ) | |
| REAR ADM. DAVID M. THOMAS, JR.,<br>    Commander, Joint Task Force – GTMO<br>    JTF – GTMO<br>    APO AE 09360; and | ) ) ) ) | |
| | ) | |
| ARMY COL. BRUCE VARGO,<br>    Commander, Joint Detention Operations)<br>    Group, Joint Task Force – GTMO<br>    JTF – GTMO<br>    APO AE 09360, | ) ) ) ) ) | |
| | ) | |
| *Respondents/Defendants.* | ) | |

**PRELIMINARY STATEMENT**

1.     Mohammed Sulaymon Barre ("Barre" or "Petitioner") seeks the Great Writ.  He

has been subjected to unlawful detention for more than six years and is entitled to an order

requiring his immediate release from imprisonment at the United States Naval Station at

Guantánamo Bay, Cuba ("Guantánamo").  He is entitled to relief under the historical common

law, under the Constitution and laws of the United States, and under the Supreme Court's holding in *Boumediene v. Bush*, __ S.Ct. __, Nos. 06-1195, 06-1196, 2008 WL 2369628 (June 12, 2008).

2.    Barre is from Somaliland, formerly the northern region of Somalia that declared its independence in 1991. He fled persecution in Somalia more than a decade ago, and with the assistance of the United Nations High Commissioner for Refugees (UNHCR), obtained asylum in Pakistan.[1]

3.    Barre is a civilian and a victim of wrongful imprisonment. He was gainfully employed and living with his wife far from any battlefield when he was abducted from his home in Pakistan in the middle of the night in November 2001; he has been detained without charge or trial ever since. Barre was wrongly classified as an "enemy combatant" by the President of the United States, and is being held virtually *incommunicado* in military custody at the United States Naval Station at Guantánamo Bay, Cuba ("Guantánamo").

4.    Petitioner Barre has been imprisoned for more than six and a half years in a small cell, thousands of miles from his family, on the basis of incredible and unreliable evidence that he was never permitted to see, much less challenge. During this period, he has been subjected to interrogations, torture, and other cruel, inhuman and degrading treatment by U.S. officials. With no justification, and as Petitioner Barre is in his seventh year of imprisonment, Respondents continue to claim that, as an "enemy combatant," he may be held for as long as the United States is fighting the so-called "Global War on Terror."

5.    Petitioner Barre is not now, and has never been, a terrorist or terrorist sympathizer. Barre is not a combatant under U.S. and international law. He is not a member of

---

[1] UNHCR has provided undersigned counsel with documentation and information confirming Petitioner's refugee status and his numerous interactions with the UNHCR office in Pakistan and its affiliates during the decade in which he was under their protection in Pakistan. See Convention Relating to the Status of Refugees, July 28, 1951, 189 U.N.T.S. 150.

any nation's military; has never fought alongside any nation's armed forces; has not borne arms against the United States or its allies anywhere in the world; was not captured on or near any battlefield; was not captured by U.S. forces; and has never engaged in any military activity. Petitioner was never in Afghanistan during the international armed conflict between the United States and the Taliban government in that country, except when U.S. forces imprisoned and tortured him at military bases in Kandahar and Bagram before sending him to Guantánamo.

6.    Barre has not violated international humanitarian or human rights law, and is not an "unlawful" combatant. Nor has he been found by any tribunal, competent or otherwise, to be an "unlawful enemy combatant," a category of combatant heretofore unrecognized under U.S. and international law. *See* Brief of *Amici Curiae* Specialists in the Law of War at 3, 13, *Al-Marri v. Wright*, 487 F.3d 160 (4th Cir. 2006) (No. 06-7427) (noting that the government has used "various constructions of enemy combatant since 2001," which are of "unprecedentedly broad and vague scope," and asserting that this practice conflicts with the laws of war). Barre is thus not subject to trial by military commission.

7.    Barre is detained without lawful basis, without charge, and without any fair process by which he might challenge his detention. He is a civilian under U.S. and international law. However, Respondents continue to imprison him without charge or trial in military custody; have not allowed undersigned counsel meaningful access to him in Guantánamo; and have refused to provide any factual or legal basis for his indefinite detention. Respondents also notably failed to notify UNHCR that there were internationally recognized refugees imprisoned at Guantánamo, including Petitioner Barre, until UNHCR discovered this information on its own and wrote to Respondent in December 2006. *See* Carol Rosenberg, *Two with Refugee Status Found in Detention Camp*, Miami Herald, Jan. 30, 2007, at A3.

8.    Instead, after holding Petitioner virtually *incommunicado* for more than two years after his arrival at Guantánamo, Respondents subjected him to a Combatant Status Review Tribunal ("CSRT"), which, pursuant to a July 2004 Department of Defense ("DOD") order, was supposed to determine whether he should be detained indefinitely in military custody as an "enemy combatant."[2]

9.    The order establishing the CSRTs defines "enemy combatant" as "an individual who was part of or supporting Taliban or al Qaeda forces, or associated forces that are engaged in hostilities against the United States or its coalition partners," including "any person who has committed a belligerent act or has directly supported hostilities in aid of enemy armed forces." *See supra* note 2. That definition is inconsistent with, and impermissibly exceeds, the definition of an "enemy combatant" under *Hamdi v. Rumsfeld*, 542 U.S. 507, 516 (2004) (involving alleged "enemy combatant" who was "part of or supporting forces hostile to the United States or coalition partners in Afghanistan and who were engaged in an armed conflict against the United States there."). It is also inconsistent with, and impermissibly exceeds, the President's authority as Commander-in-Chief, under the laws and usages of war, and under Joint Resolution 23, Authorization for Use of Military Force, Public Law 107-40, 115 Stat. 224 (Jan. 18, 2001) ("AUMF").

10.    The CSRT panel wrongly classified Petitioner as an "enemy combatant." This determination was not based on an individualized assessment of evidence presented against Petitioner at his CSRT, and is not supported by a preponderance of the evidence against him. In particular, while the CSRT purported to conclude by a preponderance of the evidence that Petitioner was an enemy combatant, the panel reached this conclusion despite: (i) Petitioner's consistent denials that he is or ever was associated with al Qaeda or the Taliban; and (ii) the

---

[2] The July 2004 order and other CSRT regulations, as amended on July 14, 2006, are available at http://www.defenselink.mil/news/Aug2006/d20060809CSRTProcedures.pdf.

complete absence of credible evidence in the record that Petitioner is or ever was associated with al Qaeda, the Taliban, or any group engaged in hostilities against the United States; and (iii) available credible evidence not included in the record that conflicts with the allegations against him.

11.    Petitioner is not, and has never been, an enemy combatant.    Indeed, on information and belief, while Respondents and other Executive Branch officials have subsequently maintained publicly that Petitioner is an enemy combatant in order to justify his ongoing imprisonment, Respondents and other Executive Branch officials have also had discussions with UNHCR and foreign governments concerning resettlement of Petitioner.  His imprisonment thus continues not because there is any legitimate reason for it, but because Respondents, by holding Petitioner in Guantánamo without access to UNHCR or his counsel, and by branding him an enemy combatant, have made it politically difficult for another country to grant him refuge.  On information and belief, the United States also refuses to grant asylum to Petitioner because to do so would undermine the repeated, demonstrably false assertions that most or all of the detainees in Guantánamo are dangerous terrorists who plotted against the United States.

12.    Petitioner thus has been denied the exoneration that the facts in his case would otherwise compel.  Instead, he has been imprisoned for more than six years in a small cell, thousands of miles from his family, on the basis of incredible and unreliable evidence that he was never permitted to see, much less challenge.  During this period, he has been subjected to interrogations, torture, and other cruel, inhuman and degrading treatment by U.S. officials.  And as Petitioner embarks on his seventh year of indefinite detention at Guantánamo, Respondents continue to claim that, as an enemy combatant, Petitioner Barre may be held for as long as the United States is fighting the so-called "Global War on Terror."

13.     Petitioner now seeks the Great Writ of Habeas Corpus.  He is entitled to habeas corpus under the historical common law, the Constitution and laws of the United States, and the United States Supreme Court's decision in *Boumediene v. Bush*, ___ S. Ct. ___, Nos. 06-1195, 06-1196, 2008 WL 2369628 (June 12, 2008), because he is imprisoned by Respondents and other Executive officials without charge or trial in violation of U.S. and international law, including the Geneva Conventions.

14.     Petitioner also seeks additional relief, *see infra* Part V, including immediate entry of the standard protective order applicable to most Guantánamo detainee habeas cases, and immediate production of a factual return to this Petition, including production to his security-cleared counsel of all reasonably available information in the possession, custody or control of the U.S. government that bears on the issue of whether he should have been or continues to be designated as an enemy combatant, whether or not such information heretofore has been compiled.

15.     Petitioner is detained without lawful basis, without charge, and without any fair process by which he might challenge his detention.  He is being held under color and authority of the Executive, and in violation of the Constitution, laws and treaties of the United States as well as in violation of customary international law.  Accordingly, this Court should issue a Writ of Habeas Corpus compelling Respondents either to release him or to establish in this Court a lawful basis for his detention.  This Court should also order injunctive and declaratory relief as is necessary to protect Petitioner's access to this Court, his access to and opportunity to consult with counsel, his right to be free from torture and the transfer to torture, and his physical and mental health to the extent necessary to enable him to participate in and pursue the litigation of this case.

# I.
## JURISDICTION

16.    Petitioner Barre brings this action pursuant to 28 U.S.C. §§ 2241(a), (c)(1) and (c)(3) and 2242, and invokes this Court's jurisdiction under 28 U.S.C. §§ 1331, 1350, 1651, 2201, and 2202; 5 U.S.C. § 702; and Articles I, II and III of, and the Fifth and Sixth Amendments to, the United States Constitution, because he is detained under or by color of the authority of the United States, or is in custody in violation of the Constitution, laws, or treaties of the United States. Because he seeks declaratory relief, Petitioner also relies on Fed. R. Civ. P. 57.

17.    This Court is empowered under 28 U.S.C. § 2241 to grant this Writ of Habeas Corpus and to entertain the instant Petition under 28 U.S.C. § 2242. This Court is further empowered to entertain the Petition pursuant to the United States Supreme Court's rulings in *Rasul v. Bush*, 542 U.S. 466 (2004) and *Boumediene v. Bush*, __ S.Ct. __, Nos. 06-1195, 06-1196 (June 12, 2008).

18.    This Court is further empowered to declare the rights and other legal relations of the parties herein by 28 U.S.C. § 2201; to effectuate and enforce declaratory relief by all necessary and proper means by 28 U.S.C. § 2202, as this case involves an actual controversy within the Court's jurisdiction; and to issue all writs necessary or appropriate in aid of its jurisdiction by 28 U.S.C. § 1651.

19.    This Court also has jurisdiction pursuant to 28 U.S.C. § 1343(a)(4) because Petitioner is seeking to redress deprivation of rights guaranteed by the Constitution, laws, and treaties of the United States.

20.    This Court also has jurisdiction pursuant to 5 U.S.C. § 702 because Petitioner is suffering legally cognizable harm because of agency action, or has been adversely affected or

aggrieved by agency action within the meaning of the relevant statutes, and is entitled to judicial review thereof.

21.    Jurisdiction and venue reside in this judicial district because the United States exercises exclusive territorial jurisdiction and control over the United States Naval base at Guantánamo, Cuba, where Petitioner is detained; and because the Executive Order of November 13, 2001, Detention, Treatment, and Trial of Certain Non-Citizens in the War Against Terrorism, 66 Fed. Reg. 57, 833 (November 13, 2001) ("Executive Order"), was promulgated in the United States and in this judicial district, Respondents made the decision to incarcerate and detain Petitioner in the United States and in this judicial district.

## II.
## PARTIES

22.    Petitioner Mohammed Sulaymon Barre was born in the northwestern region of Somalia that has since declared its independence as the Republic of Somaliland. He is a citizen of Somalia and a UN mandate refugee granted protection by UNHCR in Pakistan. He is presently incarcerated in solitary confinement in Camp VI and held in Respondents' unlawful custody and control at the U.S. Naval Base at Guantánamo Bay, Cuba. He has been unlawfully imprisoned for nearly eighty months, including more than seventy months at Guantánamo. Barre is a son-in-law of Guantánamo prisoner Muhamed Hussein Abdallah, a/k/a Ahmad Abu Abduttawaab, who is also a UN mandate refugee. Barre was wrongly determined by a Combatant Status Review Tribunal ("CSRT") to be an enemy combatant, and is imprisoned at Guantánamo under Respondent's exclusive care, custody and control. Respondents refer to Barre by his Internment Serial Number ("ISN"), which is #567.

23.    Respondent George W. Bush is the President of the United States and Commander-in-Chief of the United States military. Petitioner Barre is being detained pursuant to President Bush's purported authority as Commander-in-Chief, under the laws and usages of

war or, alternatively, pursuant to the Executive Order of November 13, 2001, Detention, Treatment, and Trial of Certain Non-Citizens in the War Against Terrorism, 66 Fed. Reg. 57,833 (November 13, 2001) ("Executive Order"). President Bush is responsible for Barre's unlawful detention and is sued in his official capacity.

24.     Respondent Robert M. Gates is the Secretary of the United States Department of Defense. Pursuant to the President's authority as Commander-in-Chief, his authority under the laws and usages of war or, alternatively, pursuant to the Executive Order, Respondent Gates has been charged with maintaining the custody and control of Petitioner. He is sued in his official capacity.

25.     Respondent Rear Admiral David M. Thomas, Jr. is the Commander of Joint Task Force – GTMO, the task force running the detention operation at Guantánamo Bay. He has supervisory responsibility for Petitioner Barre and is sued in his official capacity.

26.     Respondent Army Colonel Bruce Vargo is the Commander of the Joint Detention Operations Group and the Joint Task Force – GTMO detention camps, including the U.S. facility where Petitioner Barre is presently held. He is the immediate custodian responsible for Petitioner Barre's detention and is sued in his official capacity.

27.     Respondents are directly responsible for any activities undertaken by or under the supervision of any officers, agents or employees acting on their behalf, or of officers, agents or employees of private contractors ("contractor employees") with whom any agency under Respondents' authority or supervision has contracted for the provision of services at Guantánamo. All references to Respondents' actions in this Petition include activities performed by Respondents' predecessors in office, including Donald H. Rumsfeld, former Secretary of Defense, agents or employees, other government agents or contractor employees.

# IV.
## STATEMENT OF FACTS

28.    Petitioner Mohammed Sulaymon Barre is a civilian and a victim of wrongful imprisonment. He is not, nor has he ever been, an enemy alien, lawful or unlawful belligerent, or combatant of any kind under any definition adopted by the United States Government in any civil or military proceeding.

29.    Petitioner Barre seeks to enforce his right to a judicial determination by an appropriate and lawful authority as to whether there is a lawful and factual basis for Respondents' determination that he is either an "enemy combatant" as defined by the United States Supreme Court in *Hamdi* or an "enemy combatant" as that term is defined and used by the Executive in the Combatant Status Review Tribunals ("CSRTs").

30.    Petitioner Barre is a victim of unlawful imprisonment. He was seized from his home in the middle of the night. He had been living with his wife who he has not seen for more than six and a half years. He was transferred between U.S. military facilities in Afghanistan before being transferred to the U.S. Naval base at Guantánamo Bay, Cuba where he has been subjected to abuse and prolonged and indefinite executive detention without lawful process. At the time of filing, Barre had been detained for nearly eighty months, and is presently imprisoned in solitary confinement in a prison facility known as Camp VI.

31.    Petitioner Barre is not properly detained under any authority, including President Bush's Commander-in-Chief authority, the laws and usages of war, and the Authorization for the Use of Military Force ("AUMF"). *See Al-Marri v. Wright*, No. 06-7427, 2007 U.S. App. LEXIS 13642 (4th Cir. June 11, 2007) (issuing writ of habeas corpus). Petitioner Barre is not, nor has he ever been, an "enemy combatant" who was "part of or supporting forces hostile to the United States or coalition partners in Afghanistan and who were engaged in an armed conflict against the United States there." *Hamdi v. Rumsfeld*, 542 U.S. 507, 516 (2004). Petitioner Barre was

not captured on the battlefield or even by U.S. forces or individuals. Petitioner Barre was not a member of any nation's military; has never fought alongside any nation's armed forces; has not borne arms against the United States or its allies anywhere in the world; was not captured on or near any battlefield; was not captured by U.S. forces; and has never engaged in any military activity. Barre is not a combatant under U.S. and international law. He has not violated international humanitarian or human rights law, and is not an "unlawful" combatant. Prior to his detention, he did not commit any violent act against any American person or property. He had no involvement, direct or indirect, in the terrorist attacks on the United States on September 11, 2001, the ensuing armed conflict, or any act of international terrorism attributed by the United States to Al Qaeda. Indeed, the only time that Petitioner Barre was ever in Afghanistan was when U.S. forces imprisoned and tortured him at military bases in Kandahar and Bagram before sending him to Guantánamo.

## A. U.S. DETENTION POLICY

### 1. The Authorization for the Use of Military Force

32. In the wake of the September 11, 2001 attacks on the United States, the United States, at the direction of President Bush, began a massive military campaign against the Taliban Government, then in power in Afghanistan. On September 18, 2001, a Joint Resolution of Congress authorized President Bush to use force against the "nations, organizations, or persons" that "planned, authorized, committed, or aided the terrorist attacks on September 11, 2001, or [that] harbored such organizations or persons." Joint Resolution 23, Authorization for Use of Military Force, Public Law 107-40, 115 Stat. 224 (Jan. 18, 2001) ("AUMF").

### 2.    The Executive Order

33.    On November 13, 2001, Respondent Bush issued an Executive Order authorizing then Secretary of Defense Donald Rumsfeld, the predecessor of Respondent Gates, to detain indefinitely anyone Respondent Bush has "reason to believe":

(i)    is or was a member of the organization known as al Qaeda;

(ii)    has engaged in, aided or abetted, or conspired to commit, acts of international terrorism, or acts in preparation therefor, that have caused, threaten to cause, or have as their aim to cause, injury to or adverse effects on the United States, its citizens, national security, foreign policy, or economy; or

(iii)    has knowingly harbored one or more individuals described in subparagraphs (i) and (ii).

*See* Executive Order, 66 Fed. Reg. 57,833, §2 (November 13, 2001). President Bush must make this determination in writing. The Executive Order was neither authorized nor directed by Congress, and is beyond the scope of the AUMF.

34.    The Executive Order purports to vest President Bush with the sole discretion to identify individuals who fall within its purview. It establishes no standards governing the exercise of his discretion. Once a person has been detained, the Executive Order contains no provision for that person to be notified of the charges he may face or the basis of his detention. The Executive Order authorizes detainees to be confined indefinitely without charges or the opportunity to challenge the basis for their detention. It contains no provision for a detainee to be notified of his rights under domestic and international law, and provides neither the means to contact and secure counsel, nor rights to notice of consular protection or to consular access at the detainee's request. It provides no right to appear before a neutral tribunal to review the basis for or the legality of a detainee's continued detention and contains no provision for recourse to an Article III court. Indeed, the United States Supreme Court in *Rasul v. Bush*, 542 U.S. 466 (2004), invalidated the Executive Order's provision barring federal review of the legality of the

detainees' imprisonment. The Executive Order purports to authorize indefinite and unreviewable detention, based on nothing more than President Bush's written determination that an individual is subject to its terms.

35.    The Executive Order was promulgated in the United States and in this judicial district, the decision to incarcerate Petitioner was made by Respondents in the United States and in this judicial district, the decision to detain Petitioner at Guantánamo was made in the United States and in this judicial district, and the decision to continue detaining Petitioner was, and is, being made by Respondents in the United States and in this judicial district.

### 3.    Guantánamo Bay Naval Station

36.    On January 11, 2002, the U.S. military began transporting prisoners captured in Afghanistan to Camp X-Ray at the United States Naval Base in Guantánamo Bay, Cuba. In April 2002, prisoners were transferred to Camp Delta, a more permanent prison facility at Guantánamo. Currently, prisoners are housed in Camp Echo; Camp Delta; and the maximum-security detention centers known as Camps V and VI, where detainees are kept in solitary confinement.

37.    The U.S. military has held detainees at Guantánamo virtually *incommunicado*. The U.S. government has deprived those imprisoned there of any lawful process. They were not allowed to appear before any lawful civilian or military tribunal. For years, they were deprived of any access to counsel, and their access to counsel has been otherwise restricted. *See, e.g., Razak v. Bush*, 05-1601, dkt. 41 (Dec. 1, 2006) (rejecting government attempt to deprive detainee of counsel access through a challenge to his "next friend" authorization); David Luban, *Lawfare and Legal Ethics in Guantánamo*, 60 Stan. L. Rev. (forthcoming); Martha Rayner, *Roadblocks to Effective Representation of Uncharged, Indefinitely Detained Clients at Guantánamo Bay Military Base*, 30 Fordham Int'l L.J. 485 (2007).

38.     Detainees at Guantánamo have been held under conditions that violate their constitutional and international rights to dignity and freedom from torture and from cruel, inhuman and degrading treatment or punishment. *See, e.g.*, Amnesty International, *Guantánamo and Beyond: The Continuing Pursuit of Unchecked Executive Power*, at 83-115 Ch. 12-13, AMR 51/063/2005 (13 May 2005); Physicians for Human Rights, *Break Them Down: Systematic Use of Psychological Torture by US Forces*, Ch. 3 (2005); United Nations Press Release, *United Nations Human Rights Experts Express Continued Concern About Situation of Guantánamo Bay Detainees*, Feb. 4, 2005; International Committee of the Red Cross, Press Release, *The ICRC's Work at Guantánamo Bay*, Nov. 30, 2004; International Committee of the Red Cross, Operational Update, *US Detention Related to the Events of September 11, 2001 and Its Aftermath - the Role of the ICRC*, July 26, 2004; Amnesty International, *United States of America: Human Dignity Denied: Torture and Accountability in the "War on Terror"*, at 22 (Oct. 27, 2004) (available at http://web.amnesty.org/library/Index/ENGAMR 511452004); *see also* Barry C. Scheck, *Abuse of Detainees at Guantánamo Bay*, The Nat'l Assoc. of Criminal Defense Lawyers Champion, Nov. 2004, at 4-5.

39.     Many of these violations – including prolonged isolation, twenty-eight hour interrogations, extreme and prolonged stress positions, sleep deprivation, sensory assaults, removal of clothing, hooding, and the use of dogs to create anxiety and terror – were actually interrogation techniques approved for use at Guantánamo by the most senior Department of Defense lawyer. *See* Action Memo from William J. Haynes II, General Counsel, Department of Defense, to Secretary of Defense (Nov. 27, 2002); *Pentagon Working Group Report on Detainee*

*Interrogations in the Global War on Terrorism: Assessment of Legal, Historical, Policy and Operational Considerations*, at 62-65 (Apr. 4, 2003).[3]

40.    In a confidential report to the United States Government, the International Committee of the Red Cross ("ICRC") charged the United States military with intentional use during interrogations of psychological and physical coercion on prisoners at Guantánamo that is "tantamount to torture." *See* Neil A. Lewis, *Red Cross Finds Detainee Abuse in Guantánamo*, N.Y. Times, Nov. 30, 2004, at A1.  The report includes details how doctors and other medical workers at Guantánamo participated in planning for interrogations.  *Id.*; *see also* M. Gregg Bloche & Jonathan H. Marks, *When Doctors Go to War*, N. Engl. J. Med., Jan. 6, 2005, at 3-4.

41.    Memoranda by the Federal Bureau of Investigation ("FBI") have detailed torture and "highly aggressive interrogation techniques," including 24-plus hour interrogations involving temperature extremes, dogs, prolonged isolation, and loud music.  *See, e.g.*, Carol D. Leonnig, *Guantánamo Detainee Says Beating Injured Spine; Now in Wheelchair, Egyptian-Born Teacher Objects to Plan to Send Him to Native Land*, Wash. Post, Aug. 13, 2005, at A18; Amnesty International, *Guantánamo and Beyond: The Continuing Pursuit of Unchecked Executive Power*, at 83-115 Ch. 12-13, AMR 51/063/2005 (13 May 2005); Amnesty International, *Guantánamo: An Icon of Lawlessness*, Jan. 6, 2005, at 3-5; *see also* Neil A. Lewis, *Fresh Details Emerge on Harsh Methods at Guantánamo*, N.Y. Times, Jan. 1, 2005, at A11; Carol D. Leonnig, *Further Detainee Abuse Alleged; Guantánamo Prison Cited in FBI Memos*, Wash. Post, Dec. 26, 2004, at A1; Neil A. Lewis & David Johnston, *New F.B.I. Memos Describe*

---

[3] Additional details of the cruel and degrading conditions suffered by detainees at Guantánamo are set out at length in a statement by numerous released British detainees.  See Shafiq Rasul, Asif Iqbal & Rhuhel Ahmed, Composite Statement: Detention in Afghanistan and Guantánamo Bay,    300,    at    http://www.ccr-ny.org/v2/reports/docs/Gitmo-compositestatementFINAL23 july04.pdf).  The Department of Defense also informed the Associated Press that a number of interrogators at Guantánamo have been demoted or reprimanded after investigations into accusations of abuse at the facility.  See Report Details Guantánamo Abuses, Assoc. Press, Nov. 4, 2004.

*Abuses of Iraq Inmates*, N.Y. Times, Dec. 21, 2004, at A1; Dan Eggen & R. Jeffrey Smith, *FBI Agents Allege Abuse of Detainees at Guantánamo Bay*, Wash. Post, Dec. 21, 2004, at A1; Neil A. Lewis, *F.B.I. Memos Criticized Practices at Guantánamo*, N.Y. Times, Dec. 7, 2004, at A19.

42.    Female Guantánamo interrogators have used sexual taunting, including smearing fake menstrual blood on a detainee's face, to try to break Muslim detainees. *See Gitmo Soldier Details Sexual Tactics*, Assoc. Press, Jan. 27, 2005; Eric Saar & Viveca Novak, Inside the Wire: A Military Intelligence Soldier's Eyewitness Account of Life at Guantánamo 228 (2005).

43.    The unlawful and unconstitutional interrogation techniques used by Respondents at Guantánamo include not only physical and psychological abuse but also other impermissible conduct contrary to due process requirements, including having agents of the Government present themselves as lawyers for the detainees during meetings with the detainees for the purpose of extracting information from the detainees. *See* Sam Hannel, *Lawyers Describe Guantánamo Detainees*, Seattle Post-Intelligencer, Jan. 19, 2005.

44.    Respondents, acting individually or through their agents, have stated that whatever limitations apply on coercive interrogation techniques used by U.S. military officials under the auspices of the Department of Defense *do not apply* to interrogations conducted by agents of the CIA or other entities under President Bush. *See* Eric Lichtblau, *Gonzales Says '02 Policy on Detainees Doesn't Bind CIA*, N.Y. Times, Jan. 19, 2005, at A17; Dan Eggen and Charles Babington, *Torture by U.S. Personnel Illegal, Gonzales Tells Senate*, Wash. Post, Jan. 18, 2005, at A4.

45.    In published statements, President Bush and then Defense Secretary Rumsfeld, and predecessors of Respondents Thomas and Vargo, respectively, Lehnert and Carrico, have proclaimed that the United States may hold the detainees under their current conditions indefinitely. *See, e.g.*, Roland Watson, The Times (London), Jan. 18, 2002 ("Donald Rumsfeld,

the U.S. Defense Secretary, suggested last night that Al-Qaeda prisoners could be held indefinitely at the base. He said that the detention of some would be open-ended as the United States tried to build a case against them."); Lynne Sladky, Assoc. Press, Jan. 22, 2002 ("Marine Brig. Gen. Mike Lehnert, who is in charge of the detention mission, defended the temporary cells where detainees are being held . . . . 'We have to look at Camp X-ray as a work in progress . . .' Lehnert told CNN. Lehnert said plans are to build a more permanent prison 'exactly in accordance with federal prison standards . . . .'"); John Mintz, *Extended Detention in Cuba Mulled*, Wash. Post, Feb. 13, 2002 ("As the Bush Administration nears completion of new rules for conducting military trials of foreign detainees, U.S. officials say they envision the naval base at Guantánamo Bay, Cuba, as a site for the tribunals and as a terrorist penal colony for many years to come.").

46.     According to the Department of Defense, detainees who are adjudged innocent of all charges by a military commission may nevertheless be kept in detention at Guantánamo indefinitely. *See* Dep't of Defense Press Background Briefing of July 3, 2003, *available at* http://www.defenselink.mil/transcripts/2003/tr20030703-0323.html.

47.     Counsel for Respondents have also consistently maintained that the United States may hold the detainees under their current conditions indefinitely. *In re Guantánamo Detainee Cases*, Nos. 02-CV-0299 (CKK), *et al.*, (D.D.C.), Tr. of Dec. 1, 2004 Oral Argument on Motion to Dismiss at 22-24, statements of Principle Deputy Associate Att'y Gen. Brian Boyle; *see also* Dana Priest, *Long-Term Plan Sought for Terror Suspects*, Wash. Post, Jan. 2, 2005, at A1. Moreover, the Government has constructed a more permanent facility at Guantánamo. *See* Drake Bennett, *The Road from Guantánamo*, Boston Globe, June 25, 2006; *see also* Christopher Cooper, *In Guantánamo, Prisoners Languish in a Sea of Red Tape*, Wall St. J., Jan. 26, 2005, at A1; *Guantánamo Takes on the Look of Permanency*, Assoc. Press, Jan. 9, 2005.

**4.    Rendition and Transfers to Torture**

48.    During interrogations at Guantánamo, detainees have been threatened with rendition or transfer to countries that permit indefinite detention without charge or trial and/or routinely practice torture.  The U.S. government has also allowed foreign interrogators from countries that routinely subject those in their custody to torture and/or cruel, inhuman or degrading treatment access to detainees at Guantánamo; foreign interrogators have threatened and abused their nationals while detained in Guantánamo.  *See* Oversight and Review Division, Office of the Inspector General, U.S. Dept. of Justice, *A Review of the FBI's Involvement in and Observations of Detainee Interrogations in Guantanamo Bay, Afghanistan, and Iraq*, 183-84, May 2008; Justin Rood, *Gitmo Personnel Aided Brutal Regimes, Group Charges*, ABC News, June 3, 2008.

49.    The United States has secretly transferred detainees to countries which routinely engage in torture and/or cruel, inhuman or degrading treatment without complying with the applicable legal requirements for extradition.  This practice, known as "extraordinary rendition," is sometimes used to facilitate interrogation by subjecting detainees to torture.  *See* Jane Mayer, *Outsourcing Torture: The Secret History of American's "Extraordinary Rendition" Program*, New Yorker, Feb. 14, 2005, at 106.

50.    The United States Government's practice of extraordinary rendition has been well documented by major American and international news organizations, including, *inter alia*, the *Washington Post*, the *Los Angeles Times*, and the British Broadcasting Corporation (the "BBC").  According to news accounts:

> Since September 11, the U.S. government has secretly transported dozens of people suspected of links to terrorists to countries other than the United States bypassing extradition procedures and legal formalities, according to Western diplomats and intelligence source.  The suspects have been taken to countries . . . whose intelligence services have close ties to the CIA and where they can be subjected to interrogation tactics – including torture and

> threats to families – that are illegal in the United States, the sources said. In some cases, U.S. intelligence agents remain closely involved in the interrogations, the sources said.

Rajiv Chanrasekaran & Peter Finn, *U.S. Behind Secret Transfer of Terror Suspects*, Wash. Post, Mar. 11, 2002, at A1; *see also* Dana Priest, *Long Term Plan Sought for Terror Suspects*, Wash. Post, Jan. 2, 2005, at A1 ("The transfers, called 'renditions,' depend on arrangements between the United States and other countries, such as Egypt . . ., that agree to have local security services hold certain suspects in their facilities for interrogation by CIA and foreign liaison officers.").

51.     The U.S. government has forcibly transferred detainees from Guantánamo to the custody of countries that regularly engage in torture and cruel, inhuman and degrading treatment of those in custody despite domestic and international legal prohibitions against these transfers. *See, e.g.*, Human Rights Watch, *The "Stamp of Guantánamo":  The Story of Seven Men Betrayed by Russia's Diplomatic Assurances to the United States* (Mar. 2007), 16-17 (quoting one detainee recalling that his interrogators at Guantánamo warned him:  "'We'll send you to Russia . . . They'll string you up there' and that kind of thing"; and another detainee recalling his interrogators stating:  "'If you don't tell us the truth, we'll send you to Afghanistan, and if after Afghanistan anything is left of you, you will be sent to Russia where you will be tortured, you will have no fingers left."); Human Rights Watch, *Ill-Fated Homecomings:  A Tunisian Case Study of Guantanamo Repatriations* (Sept. 2007).

### 5.    Efforts to Obstruct Detainees' Access to Courts to Challenge Their Detention

52.     Prisoners incarcerated at Guantánamo are entitled to test the legality of their detention in the federal courts. *See Rasul v. Bush*, 542 U.S. 466 (2004); *Boumediene v. Bush*, __ S.Ct. __, Nos. 06-1195, 06-1196, 2008 WL 2369628 (June 12, 2008).

53.     Respondents have repeatedly acted to prevent detainees at Guantánamo from accessing lawyers and the courts to challenge their detention.

54.     The government has repeatedly frustrated the prisoners' right to have access to lawyers.  For more than two years, Respondent Bush and then Secretary Rumsfeld, the predecessor to Respondent Gates, denied the detainees from access to counsel in its entirety.  Only after the Supreme Court first held that Guantánamo detainees had the right to test the legality of their detention in federal courts through petitions for habeas corpus, in June 2004, thirty months after the first detainees were brought to Guantánamo, did lawyers begin to have access to Guantánamo detainees.

55.     Despite the necessity of efforts to secure authorization to represent Guantánamo detainees through "next friends" because of the barriers that the government has erected to securing direct authorizations from detainees, the government has consistently challenged these "next friend" authorizations as either presumptively invalid for the representation of Guantánamo detainees, or impermissible as regards particular detainees. *See, e.g.*, *Razak v. Bush*, 05-1601, dkt. 41 (Dec. 1, 2006) ("[The detainee] is unfamiliar with the United States Court System.  He does not speak English.  He likely does not know what the term *habeas corpus* means.  He has no criminal charges against him.  He has every reason to distrust his captors and keepers. . . .He has every reason to challenge his confinement. . . . He cannot communicate with an attorney, not does he even know at present that he has an attorney.  He has no expectation of release, ever.  In light of these facts, there can be little doubt in the Court's mind that Mr. Al Razak is not able to challenge the legality of his detention.").

56.     In a blatant violation of their obligation under the protective order and the Supreme Court's mandate, military personnel at Guantánamo have attempted to intimidate prisoners and persuade them not to work with lawyers at all, or with particular lawyers. Some detainees have been told that their lawyers are unable to provide any benefit to them, or even that the existence of a lawyer will delay a detainee's release from prison.  In multiple instances,

military personnel have told prisoners that they should not work with particular lawyers because the lawyers were Jewish or homosexual, regardless of the lawyer's religious beliefs or sexual orientation. *See generally* David Luban, *Lawfare and Legal Ethics in Guantánamo*, 60 Stan. L. Rev. (forthcoming); Martha Rayner, *Roadblocks to Effective Representation of Uncharged, Indefinitely Detained Clients at Guantánamo Bay Military Base*, 30 Fordham Int'l L.J. 485 (2007).

57.    Military personnel have placed undue burdens on prisoners who express a desire to meet with a lawyer in order to discourage the prisoner from accessing this right.  When lawyers were first allowed on the base, prisoners were forced to sit in isolation in Camp Echo for as long as eleven days prior to a legal visit if they wanted to see a lawyer, and have been held an equal time afterwards.  Multiple prisoners have been told that they were being taken to an interrogation when in actuality they were being taken to meet with their legal counsel.  In some of these instances, a prisoner's resistance to being moved for an interrogation is then conveyed to the attorney as a refusal to see his lawyer.

58.    Less than two weeks after the Supreme Court first held that Guantánamo prisoners have the right to challenge the legality of their detention through petitions for the writ of habeas corpus in federal court, *Rasul v. Bush*, 542 U.S. 466 (2004), the Executive hastily created the Combatant Status Review Tribunal ("CSRT") process.  The Wolfowitz Order, issued July 7, 2004, set forth provisions governing the standards and procedures to be used by the CSRTs in reviewing purported prior determinations that each prisoner was an "enemy combatant."  On July 29, 2004, Navy Secretary England issued the specific procedures governing the CSRTs.

59.    The CSRT rules and procedures promulgated by Respondents are inconsistent with the Constitution and laws of the United States.  A CSRT is a non-adversary hearing

conducted pursuant to rules and procedures that are unfair in design and biased in practice. For example, under the CSRT rules and procedures, every detainee is:

(a)    Denied access to counsel;

(b)    Denied the right to see the evidence against him;

(c)    Denied the right to confront, or even know the identity of, his accusers;

(d)    Denied the right to call witnesses;

(e)    Denied the right to present evidence;

(f)    Denied the right to know how the military collected evidence; and

(g)    Denied an impartial tribunal because the CSRT must presume that evidence against a detainee (which he has not seen) is genuine and accurate.

The CSRT rules and procedures further allow for the consideration of hearsay evidence and/or evidence obtained by torture or coercion. These rules and procedures in practice and effect virtually compel the CSRT conclusion that the detainee is an "enemy combatant."

60.    The CSRTs are incapable of determining who is or is not properly detained by Respondents as an "enemy combatant." Even where a CSRT determines that a detainee is actually innocent of any offense or wrongdoing, that detainee may continue to be held virtually *incommunicado*, indefinitely, without charge, without access to counsel, and without any meaningful opportunity to challenge the legality of his detention. Respondents have held detainees who have been determined through the CSRT process to be "no longer enemy combatants" or "non-enemy combatants" without affording them the right to an adequate and meaningful judicial process.

61.    The Defense Department subsequently created annual Administrative Review Board ("ARB") hearings purportedly to determine whether prisoners designated as enemy

combatants should be released from Guantánamo on the grounds that they pose no threat to the United States, nor have any intelligence value. The ARB hearings suffer from the same procedural deficiencies as the CSRT processes. Moreover, their findings are evidently of limited significance. In 2007, only approximately thirty percent of the approximately 115 men transferred out of Guantánamo had been "cleared" by their ARBs; the rest had been transferred without having officially been cleared. Moreover, at the time of filing, approximately fifty men cleared by their ARBs, including some who had been cleared for years, remain in Guantánamo.

62. On December 30, 2005, Respondent Bush signed into law the Detainee Treatment Act of 2005, Pub. L. No. 109-148, §§ 1001-1006, 119 Stat. 2680, 2739-45 (2005) ("DTA"). Section 1005(e)(1) of the DTA amended 28 U.S.C. § 2241 to eliminate the jurisdiction of the federal courts to hear or consider petitions for Writs of Habeas Corpus and other actions brought by or on behalf of detainees held in Guantánamo filed after the date of its enactment.

63. Section 1005(e)(2)(A) of the DTA granted the United States Court of Appeals for the District of Columbia Circuit "exclusive jurisdiction" to determine the validity of any final decision of a Combatant Status Review Tribunal ("CSRT") that an alien is properly detained as an "enemy combatant." Section 1005(e)(2)(C) also provided that the applicable "scope of review" by the Court of Appeals is limited to determining whether a final CSRT decision "was consistent with the standards and procedures specified by the Secretary of Defense," and "to the extent the Constitution and laws of the United States are applicable, whether the use of such standards and procedures to make the determination is consistent with the Constitution and laws of the United States." Section 1005(e) of the DTA fails to provide the full measure of process, rights and remedies required by the Suspension Clause of the United States Constitution, Art. I, § 9, cl. 2. *See Boumediene v. Bush*, ___ S.Ct. ___, Nos. 06-1195, 06-1196, slip op. at 64 (June 12, 2008) (holding that "the Government has not established that the detainees' access to the

statutory review mechanisms at issue is an adequate substitute for the writ of habeas corpus" and that "MCA § 7 thus effects an unconstitutional suspension of the writ").

64.    On June 29, 2006, the Supreme Court for a second time recognized that prisoners at Guantánamo had a right to petition the federal courts for Writs of Habeas Corpus, *Hamdan v. Rusmfeld*, 548 U.S. 557 (2006), and that the DTA failed to remove from the courts jurisdiction to consider pending habeas petitions. *Id.* at 749.

65.    On October 17, 2006, less than four months after the Supreme Court's ruling in *Hamdan*, Respondent Bush signed into law the Military Commissions Act of 2006 ("MCA"), Pub. L. No. 109-366, 120 Stat. 2600 (2006).  Section 7 of the MCA further amended 28 U.S.C. 2241 to remove the jurisdiction of any "court, justice, or judge . . . to hear or consider an application for a writ of habeas corpus filed by or on behalf of an alien detained by the United States who has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination."  The MCA provision applied both prospectively and retrospectively.  The MCA aimed to situate the narrow review mechanism established by the DTA as the exclusive mechanism for non-citizens in U.S. custody classified as enemy combatants.

66.    On June 12, 2008, the Supreme Court ruled for the third time that the Executive had overstepped its constitutional bounds in denying judicial review to prisoners at Guantánamo. In *Boumediene v. Bush*, __ S.Ct. __, Nos. 06-1195, 06-1196 (June 12, 2008), the Court held that detainees maintain a constitutional privilege of habeas corpus, and suggested that proceedings in which detainees do not have access to counsel, and evidence is not reasonably available to them, may raise due process concerns.  The Court held that Section 7 of the MCA is unconstitutional on its face because it violates the Habeas Corpus Suspension Clause of the United States Constitution, Art. I, § 9, cl. 2, *Boumediene*, slip op. at 64, and therefore does not deprive this

Court of jurisdiction to hear or consider this Petition, and grant the relief that Petitioner seeks herein. *Boumediene v. Bush*, __ S.Ct. __, Nos. 06-1195, 06-1196, slip op. 50 (June 12, 2008) ("We do consider it uncontroversial, however, that the privilege of habeas corpus entitles the prisoner a meaningful opportunity to demonstrate that he is being held pursuant to "the erroneous application or interpretation" of relevant law.  And the habeas court must have the power to order the conditional release of an individual unlawfully detained. . . .These are the easily identified attributes of any constitutionally adequate habeas corpus proceeding.  But, depending on the circumstances, more may be required.")

## B. PETITIONER MOHAMMED SULAYMON BARRE

### 1. Barre's Flight From Somalia As a Refugee

67.    Petitioner Barre was born in 1964 or 1965.  He received a Bachelor's Degree in Agriculture from the University of Agriculture near Mogadishu, the Somali capital.  While Barre was studying in the university, civil war erupted in Somalia and Barre's family was persecuted by the Somali dictator, Mohammed Said Budee.  After Barre completed his studies, he was forced to leave Mogadishu because of the escalating war; he returned to the region where his family lived.

68.    The subsequent years grew still more dangerous in Somalia.  In 1991, the Somali dictator Mohammed Said Budee was ousted from power and the country descended into a state of near anarchy that continues to this day.  As a result of the chaos and violence that consumed the country, Barre was forced to flee Somalia entirely in the early 1990s hoping to rebuild his life in a country that was safe.

69.    Barre fled Somalia with a valid passport transiting through India to Pakistan.  He traveled from India to Pakistan after having heard that the UNHCR office in Islamabad, Pakistan

provided the opportunity for Somali refugees fleeing the war to secure official recognition, United Nations protection and the opportunity to travel. He traveled legally to Pakistan.

70.     Soon after Barre arrived in Pakistan, he went to the United Nations office and applied for refugee protection. He was granted UNHCR mandate refugee status in May 1990 and had numerous subsequent personal interactions with the UNHCR office in Pakistan or their local partner agency, making personal contact nineteen times over the eleven years he resided in Pakistan. *See* Letter from Andrew Painter, United Nations High Commissioner for Refugees to J. Wells Dixon, Center for Constitutional Rights (Feb. 27, 2008) (*hereinafter* UNHCR Letter). Indeed, his last in-person interaction with the UNHCR was on July 3, 2001, where he received and signed a refugee certificate only four months prior to the home raid and abduction which precipitated his transfer to Guantánamo. Less than one year earlier, on November 21, 2000, the U.S. government Immigration and Naturalization Service (INS), whose activities are now administered by the Department of Homeland Security (DHS), conducted a resettlement interview with Barre to determine whether he would be a beneficiary of the U.S. resettlement program transferring refugees from other parts of the world for protection in the United States. *Id.*

71.     Barre lived and worked in Karachi, Pakistan. In Karachi, Barre worked for the Dahabshiil Company, a well-known international money transfer company with agents in 34 countries throughout the world, including agents in the United States and the United Kingdom. Dahabshiil's clients include United Nations organizations, international and local non-governmental organizations, the British Broadcasting Corporation, and the Somali diaspora. *See* Dahabshiil Company website, www.dahabshiil.com, available as Exhibit D-6 to Unclassified Record of Combatant Status Review Tribunal (Jan. 20, 2005) (*hereinafter* CSRT Record) (attached as Ex. 1).

72.    Barre did the same work that other Dahabshiil agents did, including agents operating openly and lawfully in the United States. His work consisted primarily of transferring money for Somalis living in Karachi, who needed to exchange money with their relatives in Somalia who did not have access to banks because of the civil war.

73.    As an employee of Dahabshiil, customers could obtain Barre's phone number from the Dahabshiil website. He transferred between approximately one and five transactions per day, most of which were small transfers. All of his transactions were documented by fax records Petitioner Barre maintained in his home.

### 2.    Barre's Abduction in a Pakistani Raid of His Home

74.    Barre was one of the earliest victims of house raids by the Pakistani military after the U.S. invasion of Afghanistan. Andy Worthington, *The Guantánamo Files* 143 (2007) ("The first house raids—based on intelligence that was often extremely suspect—took place in November 2001. One of the first prisoners was Mohammed Sulaymon Barre, a 37-year-old Somali, who had been living in Pakistan, as a UN-approved refugee, since fleeing his homeland during its ruinous civil war in the early 1990s.").

75.    While Barre was living and working in Karachi, he was questioned three times at his home by Pakistani intelligence officials. These incidents occurred within approximately a three-week period of each other, before his capture. In each encounter, the agents asked Barre about his job and what he did for a living. He did not worry about these interrogations because he did not believe that he had done anything wrong.

76.    However, on the night of November 1, 2001, between 2:30 a.m. and 3:00 a.m., Barre was arrested by Pakistani officials while at home with his wife. He was taken away in the middle of the night to a Pakistani prison, told that he was merely being investigated and would

be released in the morning.  Barre nonetheless was detained in the Pakistani prison for about four months by both Pakistani and U.S. officials.

77.    During his four months in detention in a Pakistani prison, Barre was interrogated by U.S. forces at least three times.

78.    Barre was told that he was arrested because of telephone numbers found on a list of phone calls made to his house and purportedly linked to the al-Wafaa organization, a non-governmental Islamic charity.  Barre was assured that because he worked for such a large company, Dahabshiil, and his phone number was listed publicly on their website, it would not be unusual to talk to many people on the phone.  Barre was also told by the Pakistanis that he would be released and sent home since their investigation was completed.

79.    Instead, Barre was blindfolded and handed over to U.S. forces along with another group of prisoners arrested in Karachi.  U.S. forces transferred Barre in a military airplane to Kandahar, Afghanistan.

80.    After three days imprisoned in Kandahar, Barre was transferred by U.S. forces with three other prisoners arrested in Karachi to the U.S. military airbase in Bagram, Afghanistan.  In Bagram, U.S. interrogators pressured Barre to confess that he belonged to al-Wafaa.  When he refused to agree to make a false confession, Barre was tortured by U.S. forces, including through physical abuse, isolation, temperature extremes, and deprivation of adequate food.  He was grabbed by the neck and thrown before being taken by force to isolation where he was deprived of basic essentials, including a blanket despite the cold temperature.  He suffered physical ailments because of the treatment he suffered in Bagram, including difficulty standing and swollen hands and feet.  Summarized Sworn Detainee Statement, at 5, *in* CSRT Record (*hereinafter* CSRT Tr.).

81.   After this abuse, a different interrogator informed Barre that he would be released and had not done anything wrong.  He acknowledged that the abusive treatment Barre suffered was an injustice.

82.   Nevertheless, after imprisonment in Bagram, Barre was transferred to Kandahar.

### 3.   Barre's Imprisonment in Guantánamo

83.   On a date in 2002 known to Respondents, the United States military transferred Barre from Kandahar to Guantánamo, where he has been held ever since, in the custody and control of Respondents.

84.   Since gaining control of Barre, the United States military has held him virtually *incommunicado.*

85.   Barre has been interrogated repeatedly by agents of the United States Departments of Defense and/or Justice, and/or the Central Intelligence Agency.

86.   Barre has been held under conditions that violate his constitutional and international rights to dignity and freedom from torture and from cruel, inhuman and degrading treatment or punishment.  Barre has been held in and surrounded by conditions of isolation; constant vulnerability to repeated interrogation and severe beatings; the threat or reality of being kept in cages with no privacy; shackled with heavy chains and irons; placed in solitary confinement or the threat of solitary confinement for minor rule infractions for prolonged periods of time; interrogated while shackled and chained in painful positions; exposed to extremes of temperature; subjected to violent behavior or the threat of violence; threatened with rendition to countries that practice torture; sexually humiliated; denied access to counsel and family, or had his access to counsel actively impeded; deprived of adequate medical care; and subjected to repeated psychological abuse.

87.    In his seventh year of imprisonment without charge or trial, Barre is in solitary confinement in Camp VI, a supermaximum security confinement facility.

### 4.    Lack of Process or Evidence Justifying Petitioner's Imprisonment

88.    Petitioner Barre has not been afforded any procedures that would satisfy his rights under the most fundamental common law notions of due process, the Constitution, laws and treaties of the United States, or customary international law.

89.    Barre not been charged with an offense and has not been notified of any pending or contemplated charges.  He has not appeared before a lawful civilian or military tribunal, or adequately informed by Respondents of his rights under the U.S. Constitution, the regulations of the U.S. military, the Geneva Conventions, the International Covenant on Civil and Political Rights, the American Declaration on the Rights and Duties of Man, the 1954 Convention Relating to the Status of Refugees or customary international law.

90.    As Petitioner did not participate in the armed conflict at any point in time, he is not properly detained pursuant to President Bush's authority as Commander-in-Chief, under the laws and usages of war, or the AUMF.  On information and belief, President Bush has never certified or determined in any manner, in writing or otherwise, that Petitioner is subject to the Executive Order.  Petitioner is not properly subject to the Executive Order, and, in any event, the Executive Order is unjust, *ultra vires*, and violates the laws, treaties, and Constitution of the United States.  Petitioner has been, and is being, detained unlawfully purportedly pursuant President Bush's authority as Commander-in-Chief and/or under the laws and usages of war.

91.    The only "process" Barre had was through the hastily created and severely inadequate CSRT and annual ARB processes.

### a.  *Petitioner Barre's CSRT Proceedings*

92.    The unclassified excerpt of Petitioner Barre's CSRT proceedings, while far from accurate or complete, reveals the following allegations against him:

(i)    he voluntarily traveled from Somalia to Pakistan (*see* CSRT Tr. at 1);

(ii)   he worked for the Dahabshiil Company in Karachi, Pakistan (*see id.* at 2); and

(iii)  he was a member of the non-governmental organization al-Wafaa, which the United States has identified as a terrorist organization (*see id.* at 3;

93.    There were no other allegations made against Petitioner Barre during his initial CSRT proceedings. Those allegations are not supported by reliable evidence, classified or unclassified, and, even if they were, are insufficient to support an enemy combatant designation by a preponderance of the evidence.

94.    Barre's response to the three allegations made during his CSRT proceedings further confirms that these claims fail to support his enemy combatant determination by a preponderance of the evidence.

95.    As to the first allegation that Barre voluntarily traveled from Somalia to Pakistan, he explained: "There was a civil war inside Somalia and anyone who wanted to leave Somalia was able to. Whoever was capable of leaving, they left. Several [Somalis] left and are now living in the United States, Europe, and other countries. I left the country because of the continuing civil war. . . . [I]s leaving the country because of civil wars a crime?" *Id.* at 1. Barre subsequently explained in greater detail that he had fled persecution in Somalia and, with the assistance of the United Nations, obtained refugee protection in Pakistan. On information and belief, no contrary evidence concerning why he left Somalia and traveled to Pakistan was ever presented to, or considered by, the CSRT. Indeed, no contrary evidence exists.

96.     As to the second allegation, Barre conceded that he worked for the Dahabshiil Company in Karachi, Pakistan. He explained that the company transfers money like a bank, and was used by Somalis who did not have access to banks during the civil war in their home country. He also pointed out that the Dahabshiil Company has several branches in countries throughout the world, especially countries with Somali communities, including the United States, Australia, Pakistan, and various European, African and Gulf countries. He explained that he worked for the company in Pakistan, receiving money and transferring it to students and families who needed it in Somalia. The money went through the company's main office in Somalia. Petitioner's name and address also appeared on the company's website; anyone with Internet access was capable of getting in touch with him. *See id.* at 2-3. In sum, the work Petitioner Barre did for the Dahabshiil Company "was the same work the other agents did, including the agents in the United States." *Id.* at 3.

97.     As to the third allegation, Petitioner Barre flatly denied that he was a member of al-Wafaa. He stated: "I never heard of the al-Wafa [sic] organization until I entered the prison in Pakistan and I have never worked for them. The people that interrogated me for the last three years know this." *Id.* at 3. Barre further explained: "After I was arrested at my house, you should have had enough evidence to show whether or not I was connected to al-Wafa [sic]. All the accusations against me are based on some telephone numbers found on a list. As I have mentioned before, my work at Dahabshiil has a website on the [I]nternet and anyone can access that website. My name and phone number was popular on that page. I would get several calls a day, some were from people I knew and some weren't. The accusations against me are based on those phone numbers." *Id.*

98.     In addition, the CSRT panel refused to allow Barre to call the alleged head of the al-Wafaa organization, who was at the time detained at Guantánamo.[4]  Barre explained: "My Personal Representative told me that the President of the Tribunal refused the witness. . . . I just wanted to ask the witness if I was from his organization or not. . . . [H]e would know who is in his organization and who wasn't." *Id.* at 4.  Barre further commented that "[d]uring the time I was here [in Guantánamo] the interrogators have never accused me of being from al-Wafa [sic]. When my Personal Representative gave me the Unclassified Summary I thought the accusation was cleared up until I saw it on the paper." *Id.* at 5.

99.     On information and belief, Barre's CSRT failed to consider that, by the time of those proceedings, he had been cleared of any connection to al-Wafaa by his interrogators and/or other agents of Respondents.

100.     Moreover, as to the claim that Petitioner was a member of al-Wafaa because his contact information may have been found on a particular list, Petitioner questioned: "[I]f they found a phone number and your calling list and that phone number belonged to someone who was wanted by the authorities, would that be a crime against you?  Does that prove the person that received the call worked for the person calling? . . . From where I sit, this isn't proof that I am part of that organization (al-Wafa [sic]).  Do you have any other proof that shows I am part of al-Wafaa?" *Id.* at 5.

101.     The CSRT further refused to allow Barre to see, comment on or otherwise defend himself against any classified evidence.  He argued to no avail: "If there is information about me, I want to be there to defend myself.  Maybe the interrogators wrote something that I never said or maybe something was translated incorrectly." *Id.* at 6.

---

[4] Notably, Abdallah Aziz Al Matrafi, a Saudi Arabian citizen and the alleged head of the al-Wafaa organization has since been released. See *infra* note 12.

102.    On information and belief, no other evidence concerning Petitioner's alleged membership in al-Wafaa was ever provided to, or considered by, his CSRT, classified or unclassified, and no evidence was ever presented to establish that al-Wafaa is a terrorist organization.

103.    Indeed, whether considered separately or together, the foregoing allegations are plainly insufficient to establish by a preponderance of the evidence that Petitioner is an enemy combatant.  Accordingly, Petitioner Barre may have been cleared for release before his CSRT or may initially have been found by his CSRT panel *not* to be an enemy combatant, but that determination may have been reversed by senior Pentagon officials because it was contrary to a preferred, predetermined finding.  *Cf., e.g.*, Mark Denbeaux & Joshua Denbeaux, *No-Hearing Hearings: An Analysis of the Proceedings of the Government's Combatant Status Review Tribunals at Guantánamo* at 3, 37-39 (Nov. 17, 2006) (showing certain detainees initially found by CSRTs not to be enemy combatants subjected to further proceedings until enemy combatant determinations obtained), *available at* http://law.shu.edu/news/final_no_hearing_ hearings_report.pdf.

104.    Nonetheless, as indicated above, Petitioner was ultimately found by his CSRT to be an enemy combatant.

**b.  *The Sum of Allegations Against Petitioner Barre in His More Than Six Years of Imprisonment***

105.    For the more than six years Petitioner Barre has been imprisoned in Guantánamo, there has been no credible evidence advanced that would justify Barre's continued detention as an "enemy combatant" or an individual who poses a threat to the United States or its allies.  The entirety of the allegations made against him during his CSRT and ARBs do not amount to illegal activity, are entirely unsubstantiated, and/or are internally inconsistent or directly contradicted by existing evidence.  Every allegation against him is invalidated below.

106.    Moreover, the allegations against him have varied dramatically during the time that he has been detained in Guantánamo even though his interrogations have largely ceased.[5] On information and belief, because the three allegations made against Barre at his initial CSRT proceedings were insufficient to support an enemy combatant determination, and because there were diplomatic barriers to his release and no countervailing diplomatic pressure that compelled it, Respondents manufactured new and further allegations against him by the time of his ARB proceedings in September 2005, to justify his continuing detention.

107.    As Petitioner later noted during his ARB proceedings in September 2005: "Based on what was mentioned before and my innocence from these accusations, I do not deserve to stay detained . . . all this time. A lot of interrogators said to me that through this war that was lead [sic] by the United States, a lot of mistakes were made and they must be corrected. *They told me many times [ ] I am here by mistake.*" Summary of Administrative Review Board Proceedings, 5 (Sept. 30, 2005) (emphasis added) (*hereinafter* 2005 ARB Tr.) (attached as Ex. 3).

108.    In the CSRT and ARBs of Petitioner Barre, Respondents have advanced the following allegations that do not amount to illegal activity, are entirely unsubstantiated, and/or are internally inconsistent or directly contradicted by existing evidence:

---

[5] Allegations appeared in his 2005 ARB that did not appear in his 2004 CSRT or his 2006 ARB. For instance, in Barre's 2005 ARB, the Department of Defense alleged that the legal organization for which Barre worked was affiliated with a company that was designated by the U.S. Office of Foreign Asset Control after Barre's detention. This allegation did not appear in his previous CSRT or his subsequent ARB.    Unclassified Summary of Evidence for Administrative Review Board in the Case of Barre, Mohammed Sulaymon, 1 (Sept. 22, 2005) (*hereinafter* 2005 ARB Factors) (attached as Ex. 2). Similarly, allegations appeared in his 2006 ARB that are inconsistent with allegations that appeared in his 2004 CSRT and 2005 ARB. For instance, in his 2006 ARB, the Department of Defense alleged that Barre was in Afghanistan until 1992 and worked in Sudan between 1992 and 1995. Unclassified Summary of Evidence for Administrative Review Board in the Case of Barre, Mohammed Soliman (*hereinafter* 2006 ARB Factors) (attached as Ex. 4). Yet, in his CSRT, one of the allegations against Barre was that he traveled from Somalia to Pakistan in 1994.

i.   In Barre's CSRT, one of the allegations against him is that he moved from
Somalia to Pakistan.  CSRT Tr. at 1.  Barre acknowledges that he fled a raging
civil war that continues to this day.  As Barre asked the President of the Tribunal,
confounded as to why this would be an allegation against him: "is leaving the
country because of civil wars a crime?"  CSRT Tr. at 1.

ii.  In Barre's CSRT, as well as in his 2005 ARB but not his 2006 ARB, Respondents
advanced as an allegation against him that he worked for the Dehabshiil money
transfer company.  CSRT Tr. at 2; 2005 ARB Tr. at 2.  *But see* Unclassified
Summary of Evidence for Administrative Review Board in the Case of Barre,
Mohammed Soliman (*hereinafter* 2006 ARB Factors) (attached as Ex. 4).  As
detailed above, Dehabshiil is a legal entity that has never been found to have any
involvement with terrorism.  Barre in no way made any attempt to conceal this
employment. He was legally employed and publicly advertised his work with this
company.   Dehabshiil, like many remittance companies that exist around the
world, filled a void that existed because of the lack of traditional banks in Somalia
and the need for the Somali diaspora, international organizations and businesses
to transfer money into and out of Somalia safely and legally.  *See, e.g.*, Samuel
Munzele Maimbo & Dilip Ratha, eds., *Remittances Development Impact and
Future Prospects* (2005).

iii. Barre's 2005 ARB lists the fact that he was detained in a house raid as one of the
allegations against him.  Unclassified Summary of Evidence for Administrative
Review Board in the Case of Barre, Mohammed Sulaymon at 2 (Sept. 22, 2005)
(*hereinafter* 2005 ARB Factors) (attached as Ex. 2).  Barre was undisputedly a
victim of an invasion of his home in November 2001.  However, this does not

constitute an illegal act by Barre or justify his continued detention as an "enemy combatant."

iv. In Barre's 2005 ARB, but in neither his CSRT nor his 2006 ARB, the Department of Defense advanced as an allegation against Barre that he traveled to Pakistan on a Jama'at al Tablighi visa. 2005 ARB Factors at 1. *But see* CSRT Record; 2006 ARB Factors. This is flatly denied, 2005 ARB Tr. at 2, entirely unsubstantiated and, moreover, contradicted by existing evidence in the form of his official passport.[6] *See id.* at 3, 10 (Barre denied that he was a member or a missionary of Jama'at al Tablighi, or that he had any knowledge of Jama'at Al Tablighi's purported ties to terrorism).

v. Barre's 2005 ARB states that he lied to receive his three-month visa as one of the factors favoring his continuing detention. 2005 ARB Factors at 2. However, the ARB provides no evidence supporting this contention. Moreover, this is clearly insufficient to justify that Barre is or ever was an "enemy combatant." As Barre noted in his response to this allegation, he did not lie to obtain a visa, but it is generally known that refugees are often forced to lie to obtain protection in their flight from great risk: "I did not do this, but the necessity of basic human needs and you know that many refugees that entered [the] United States, they entered illegally, but due to their special situation, [the] United States and other countries received them." 2005 ARB Tr. at 4.

---

[6] Moreover, even if Barre had traveled on such a visa it would not be illegal. Jama'at al Tablighi does not appear on the U.S. list of terrorist organizations and securing a visa to travel from India to Pakistan with this organization in no way justifies his "enemy combatant" designation or continued detention. See U.S. Department of Homeland Security, U.S. Customs and Border Protection, Office of Border Patrol, Terrorist Organization Reference Guide (2004).

vi.  Allegations in Barre's CSRT and 2005 ARB made no mention of any presence in Afghanistan or involvement with the mujuahadeen or al Qaeda there, or any relationship with Sudan. *See* CSRT Record; 2005 ARB Factors. However, for the first time, in Barre's 2006 CSRT, the Department of Defense advanced allegations against Barre that he was a mujahadeen in Afghanistan until 1992; that he was a member of a Kandahar institute near a mujahadeen guesthouse; that he was a participant in jihadist training in Afghanistan; and that he worked "on Usama bin Laden's compound in Khartoum, Sudan" between 1992 and 1995. 2006 ARB Factors at 1-2. First, it is implausible and unsubstantiated that new and credible intelligence arose in 2006 that supported an entirely novel factual scenario involving Barre's activities and location prior to 1995. Further, this version of events is internally inconsistent with other allegations previously made by the Department of Defense against Barre, including that he traveled from Somalia to Pakistan in 1994. Moreover, the allegations asserted are directly contradicted by official representations from UNHCR about the personal interactions Barre had with the UN or affiliate offices in Pakistan prior to 1995. A letter describing Barre's personal interactions with the UN or affiliate offices in Pakistan describes four personal visits by Barre in 1990, and seven visits by Barre between 1994 and 1995, periods in which Barre was alleged in his 2006 ARB to be in Afghanistan and Sudan respectively. *See* UNHCR Letter. There is absolutely no credible evidence that he was in Afghanistan or Sudan during this period, and certainly none that he had any involvement with Osama bin Laden or al Qaeda. Barre first set foot in Afghanistan when forcibly rendered there by U.S.

forces for detention and interrogation in U.S. military bases in Bagram and Kandahar.

vii.    In Barre's 2005 ARB, the Department of Defense made two unique allegations that did not reappear in the subsequent ARB and which related to Dahabshiil. First, the DOD alleged that Barre ran an illegal money transfer business outside of his home.   2005 ARB Factors at 1.    Second, the Department alleged that Dahabshiil was affiliated with its competitor organization, al Barakaat, which had briefly been designated by the U.S. Office of Foreign Asset Control (OFAC), and its operations correspondingly terminated.   *Id.*   This latter allegation in Barre's 2005 ARB suggested that the affiliation between Dahabshiil and al Barakaat was due to the fact that al Barakaat's customers seeking to transfer funds for terror were relocated to Dahabshiil after al Barakaat ceased operations.   These two allegations are directly contradicted by publicly available facts.   There is ample evidence that the Dahabshiil Company for which Barre worked is a legal and legitimate employer, and that Barre was not engaged in illegal activities while employed by Dahabshiil.   First, as stated above, Dahabshiil is a legal entity not implicated in terrorism and whose services resemble that of a bank for a population that lacks traditional banking services.   As noted above, Barre's work with Dahabshiil was not covert.   Indeed, his phone number was publicly listed on the company's website in order to facilitate his customers locating him.[7]    A review of Dahabshiil's website suggests a company that is vigilant about the legal

---

[7] Petitioner pointed out to his ARB panel that his work at the Dahabshiil Company was not any different than that of an ordinary banker, at least in terms of knowing one's customers: "Let's say for example a person goes to the bank and wants to transfer some money somewhere else, of course you are not going to know that person.  That person could be a bad person, you would not know what kind of person he is."  2005 ARB Tr. at 11.

complications surrounding its work – with a "Due Diligence Policy," a United Nations sponsored auditing and oversight procedure conducted by a reputable U.S.-based accounting firm, and the "careful[] and diligent[] following [of] all PATRIOT ACT requirements, including reporting, monitoring, training and auditing procedures." *See* Dahabshiil, "Due Diligence Policy," *at* www.dahabshiil.com/new/duedilipolicy.asp, available as Exhibit D-6 to CSRT Tr. Second, the transfer of customers from al Barakaat to Dahabshiil, even if that were sufficient to tarnish all those employed in Dahabshiil's 400 branches worldwide, can in no way justify tarnishing Barre. As described in the *9/11 Commission Report*, al Barakaat was designated by OFAC on November 7, 2001 – one week *after* Barre's abduction.[8] The subsequent transfer of customers who may have been implicated in terrorism from al Barakaat to Dahabshiil, if it indeed did occur, would have occurred while Barre was imprisoned.[9]

viii.   Respondents lodged an unsubstantiated allegation against Barre in his CSRT and again in his 2005 ARB, but not his 2006 ARB, an affiliation with al-Wafaa, a non-governmental Islamic charity which the U.S. government has identified as a terrorist organization. CSRT Tr. at 3-4; 2005 ARB Factors at 1. While Barre was

---

[8] See Al-Barakaat Case Study, The 9/11 Commission Report, available at http://www.9-11commission.gov/staff_statements/911_TerrFin_Ch5.pdf. The U.S. ended the official blacklist of Al Barakat. US ends Somali banking blacklist, BBC News, Aug. 28, 2006, available at http://news.bbc.co.uk/2/hi/africa/5292750.stm (noting suspicion of involvement in terrorism refuted by report on official inquiry into September 11th attacks).

[9] As to the attendant claim that some of Petitioner's counterparts in the United States did not have licenses, Petitioner pointed out that this had nothing to do with him. He commented: "If there are people violating the law of the United States, you have to take all the appropriate measures, but what I know is that Dahabshiil [C]ompany has many locations/places in the United States and they have permission to work out in the open. You are saying that I have connections with the terrorist, so what is the reason or cause? . . . I worked with the Dahabshiil just like the rest of the employees that worked with them. So where is the terror and where is my connection with them? Terror is what departed me from my country and I am one of the people who hates terror most." 2005 ARB Tr. at 4.

pressured repeatedly to admit to membership in al-Wafaa under torture in

Bagram, no evidence has been advanced to support that he is a member or in any

way knowingly or intentionally affiliated with al-Wafaa.[10]   The only affiliation

that might exist would be due to members of al-Wafaa having Barre's publicly

available phone number due to the nature of his employment with Dahabshiil.[11]

Barre first learned of al-Wafaa when he was imprisoned in Pakistan and pressured

to admit to membership in the organization.   Since then, Barre has repeatedly and

strongly countered any assertion that he is a member of al-Wafaa, urging the U.S.

military to question known members of al-Wafaa, to review exhaustively his

diligently kept files from his work, and to present evidence to him that he could

then refute.   As he stated in his 2005 ARB:

> "I was never one day a member of this organization and I did not
> hear of [it] until entering the jail in Pakistan from a Pakistani
> interrogator officer.   I spoke of this at the first tribunal that this
> accusation is not true.   I requested from them to bring the company
> director or manager that is detained here by you [so] he could
> testify [to] the truth in front of the tribunal.   The reply was that the
> tribunal president refused this request and is not allowing this
> person to attend this tribunal.   I do not know how you want me to

---

[10] Barre was imprisoned in Kandahar for three days before he was transported to Bagram Air
Base in Afghanistan. While in Bagram, interrogators pressured Barre to confess that he belonged
to al-Wafaa, but he refused. Barre was then tortured in an effort to gain a confession. According
to Barre's testimony at his CSRT: "They interrogated me and one of the interrogators told me I
was from al-Wafa [sic] and I needed to confess to that. You have no choice. I told them it
wasn't true. They pressured me. They were whisper[ing] something then spoke to the guard.
The guard came in, grabbed me by my neck and threw me. He took me in a bad way to
isolation. All my blankets, except one, were taken from me. It was freezing cold. They didn't
feed me lunch and sometimes they didn't feed me twice. At night it was very cold and if you
don't eat dinner it gets colder. This torture lasted twenty days. My hands and feet
were swollen. I wasn't able to stand because I was in so much pain. I asked for treatment and an
interrogator brought a nurse and asked if I wanted treatment. They told me they could cut my
legs to stop the pain. They did this so I would confess to the accusations that I didn't do."
CSRT Tr. at 5.
[11] At the time of filing, the Dahabshiil Company has more than twenty-five registered agents in
the United States, whose names and contact information are readily available on the Internet.
See http://www.dahabshiil.com/agents.jsp.

> prove to you my innocence from this accusation that was built upon phone numbers found in my phone memorandum. Based upon my job that I worked, I received many phone calls from people I know and from people I do not know. It wasn't necessary or requested to me to know all the phone numbers listed in the memorandum. Dahabshiil Company is not a secret or underground company. It is on the air directly in the internet and any person who has the company address can contact any agent from the company from any country in the world. You also know that I was arrested from my house where it was my workstation. Also, information sources that were with me were confiscated like the computer, files, and notebooks, which provided all the information about my job and they did not find anything that would show association with [al-Wafaa]."[12]

2005 ARB Tr. at 2-3.

109. Petitioner Barre remains imprisoned in Guantánamo without lawful process. The CSRT does not constitute the lawful process to which he is entitled to challenge the legality of his imprisonment. Moreover, his CSRT was not properly conducted in accordance with the CSRT rules and procedures promulgated or required to be promulgated by Respondents; the CSRT has not made a "final decision" that Petitioner Barre is properly detained as an "enemy combatant"; and/or the conclusion of the CSRT that Petitioner is an "enemy combatant" is not supported by a preponderance of the evidence.

110. Petitioner Barre is a Somali refugee who cannot safely be returned to Somalia, a country he fled during a civil war and a country which remains in disarray. UNHCR recognized his refugee status and granted him mandate protection. He remains at risk of being rendered, expelled or returned without lawful procedures to a country in which he will be at risk of torture or persecution.

---

[12] Notably, the United States has detained in Guantánamo men alleged to be knowingly and intentionally affiliated with al-Wafaa at the highest levels, and has released them. For instance, Abdul Aziz Al Matrafi, ISN 005, had been alleged by the United States in his CSRT to have established and presided over the al-Wafaa organization. Yet, even he has been released. Indeed, most alleged Al-Wafaa members have been released.

111.    Petitioner Barre desires to pursue in the United States courts every available legal challenge to the lawfulness of his detention.  Petitioner Barre seeks a release from detention and a safe transfer to Somaliland or another country.

## V.
### CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF

### (28 U.S.C. § 2241, 28 U.S.C. 2242, COMMON LAW - HABEAS CORPUS)

112.    Petitioner incorporates by reference all preceding paragraphs as if set forth fully herein.

113.    Section 7 of the Military Commissions Act of 2006 ("MCA"), Pub. L. No. 109-366, 120 Stat. 2600 (2006), is unconstitutional under the Suspension Clause of the Constitution, *Boumediene v. Bush*, __ S.Ct. __, Nos. 06-1195, 06-1196 (June 12, 2008), and Petitioner has a right to relief under 28 U.S.C. 28 U.S.C. § 2241, 28 U.S.C. § 2241 and the common law over his habeas claims. *See* U.S. Const. art. 1, § 9, cl. 2.

114.    Accordingly, Petitioner is entitled to habeas, declaratory, and injunctive relief as well as any other relief the court may deem appropriate.

### SECOND CLAIM FOR RELIEF

### (COMMON LAW DUE PROCESS AND DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT TO THE UNITED STATES CONSTITUTION – UNLAWFUL DEPRIVATION OF LIBERTY)

115.    Petitioner incorporates by reference all preceding paragraphs as if set forth fully herein.

116.    By the actions described above, Respondents, acting under color of law, have violated and continue to violate common law principles of due process as well as the Due Process Clause of the Fifth Amendment to the Constitution of the United States.  President Bush has ordered the prolonged, indefinite, and arbitrary detention of individuals including Petitioner,

without due process of law, and the remaining Respondents have implemented those orders. Respondents' actions deny Petitioner the process accorded to persons seized and detained by the United States military in times of armed conflict as established by, *inter alia*, the Uniform Code of Military Justice, Army Regulation 190-8, Articles 3 and 5 of the Third and Fourth Geneva Conventions, and customary international law as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

117.    To the extent that Petitioner's detention purports to be authorized by the Executive Order, that Order violates the Fifth Amendment on its face and as applied to Petitioner.

118.    Accordingly, Petitioner is entitled to habeas, declaratory, and injunctive relief as well as any other relief the court may deem appropriate.

### THIRD CLAIM FOR RELIEF

### (DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT TO THE UNITED STATES CONSTITUTION – UNLAWFUL CONDITIONS OF CONFINEMENT)

119.    Petitioner incorporates by reference all preceding paragraphs as if set forth fully herein.

120.    By the actions described above, Respondents, acting under color of law, have violated and continue to violate the right of Petitioner to be free from unlawful conditions of confinement, in violation of the Due Process Clause of the Fifth Amendment to the Constitution of the United States.

121.    Accordingly, Petitioner is entitled to declaratory and injunctive relief as well as any other relief the court may deem appropriate.

## FOURTH CLAIM FOR RELIEF

### (GENEVA CONVENTIONS – ARBITRARY DENIAL OF DUE PROCESS)

122.    Petitioner incorporates by reference all preceding paragraphs as if set forth fully herein.

123.    By the actions described above, Respondents, acting under color of law, have denied and continue to deny Petitioner the process accorded to persons seized and detained by the United States military in times of armed conflict as established by specific provisions of the Third and Fourth Geneva Conventions.

124.    Violations of the Geneva Conventions are direct treaty violations and are also violations of customary international law, and constitute an enforceable claim under 28 U.S.C. § 2241 (c)(3).

125.    Respondents are liable for this conduct described above, insofar as they set the conditions, directly and/or indirectly facilitated, ordered, acquiesced, confirmed, ratified, and/or conspired to violate the Geneva Conventions.

126.    Accordingly, Petitioner is entitled to habeas, declaratory, and injunctive relief as well as any other relief the court may deem appropriate.

## FIFTH CLAIM FOR RELIEF

### (INTERNATIONAL HUMANITARIAN AND HUMAN RIGHTS LAW – ARBITRARY DENIAL OF DUE PROCESS)

127.    Petitioner incorporates by reference all preceding paragraphs as if set forth fully herein.

128.    By the actions described above, Respondents have denied and continue to deny Petitioner the process due to persons seized and detained by the United States military in times of armed conflict as establish by customary international humanitarian and human rights law as

reflected, expressed, and defined in multilateral treaties and other international instruments and domestic judicial decisions, and other authorities.

129.    Because Respondents are detaining Petitioner "under or by color of the authority of the United States" and "in violation of the Constitution or laws or treaties of the United States," Petitioner's claim arises under 28 U.S.C. § 2241, and he is entitled to habeas relief.

130.    Petitioner is entitled to habeas, declaratory, and injunctive relief as well as any other relief the court may deem appropriate.

## SIXTH CLAIM FOR RELIEF

### (ALIEN TORT STATUTE – TORTURE)

131.    Petitioner incorporates by reference all preceding paragraphs as if set forth fully herein.

132.    By the actions described above, the Respondents directed, ordered, confirmed, ratified, and/or conspired together and with others to bring about acts that deliberately and intentionally inflicted severe physical and psychological abuse and agony upon Petitioner in order to obtain coerced information or confessions from him, punish or intimidate Petitioner or for other purposes.    Among other abuses, Petitioner has been held in and surrounded by conditions of isolation; constant vulnerability to repeated interrogation and severe beatings; the threat or reality of being kept in cages with no privacy; shackled with heavy chains and irons; placed in solitary confinement or the threat of solitary confinement for minor rule infractions for prolonged periods of time; interrogated while shackled and chained in painful positions; exposed to extremes of temperature; subjected to violent behavior or the threat of violence; threatened with rendition to countries that practice torture; sexually humiliated; denied access to counsel and family; deprived of adequate medical care; and/or subjected to repeated psychological abuse.

133.    The acts described herein constitute torture in violation of the law of nations under the Alien Tort Statute, 28 U.S.C. § 1350, in that the acts violate customary international law prohibiting torture as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

134.    Respondents are liable for said conduct because they directed, ordered, confirmed, ratified, and/or conspired together and with others to commit the acts of torture against Petitioner.

135.    Petitioner was forced to suffer severe physical and psychological abuse and agony and is entitled to habeas, declaratory, and injunctive relief and other relief to be determined at trial.

<u>**SEVENTH CLAIM FOR RELIEF**</u>

**(ALIEN TORT STATUTE – WAR CRIMES)**

136.    Petitioner incorporates by reference all preceding paragraphs as if set forth fully herein.

137.    By the actions described above, Respondents' acts directing, ordering, confirming, ratifying, and/or conspiring to bring about the torture and other inhumane treatment of Petitioner constitute war crimes and/or crimes against humanity in violation of the law of nations under the Alien Tort Statute, 28 U.S.C. § 1350, in that the acts violated, among others, the Fourth Geneva Convention, Common Article III of the Geneva Conventions and Additional Protocols I and II of the Geneva Conventions as well as customary international law prohibiting war crimes as reflected, expressed, and defined in other multilateral treaties and international instruments, international and domestic judicial decision, and other authorities.

138.    As a result of Respondents' unlawful conduct, Petitioner has been and is forced to suffer severe physical and psychological abuse and agony, and is therefore entitled to declaratory, and injunctive relief, and such other relief as the court may deem appropriate.

## EIGHTH CLAIM FOR RELIEF

### (ALIEN TORT STATUTE – CRUEL, INHUMAN OR DEGRADING TREATMENT)

139.    Petitioner incorporates by reference all preceding paragraphs as if set forth fully herein.

140.    The acts described herein had the intent and the effect of grossly humiliating and debasing Petitioner, forcing him to act against his will and conscience, inciting fear and anguish, and breaking his physical or moral resistance.

141.    The acts described herein constitute cruel, inhuman or degrading treatment in violation of the law of nations under the Alien Tort Statute, 28 U.S.C. § 1350, in that the acts violated customary international law prohibiting cruel, inhuman or degrading treatment as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

142.    Respondents are liable for said conduct in that they directed, ordered, confirmed, ratified, and/or conspired together and with others to cause the cruel, inhuman or degrading treatment of Petitioner.

143.    Petitioner was forced to suffer severe physical and psychological abuse and agony and is entitled to declaratory and injunctive relief as well as other relief to be determined at trial.

## NINTH CLAIM FOR RELIEF

### (ALIEN TORT STATUTE – ARBITRARY ARREST AND PROLONGED ARBITRARY DETENTION)

144.    Petitioner incorporates by reference all preceding paragraphs as if set forth fully herein.

145.    The acts described herein constitute arbitrary arrest and detention of Petitioner in violation of the law of nations under the Alien Tort Statute, 28 U.S.C. § 1350, in that the acts violated customary international law prohibiting arbitrary detention as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

146.    Respondents are liable for said conduct in that they directed, ordered, confirmed, ratified, and/or conspired together and with others to bring about the arbitrary arrest and prolonged arbitrary detention of Petitioner in violation of the law of nations under the Alien Tort Statute, 28 U.S.C. § 1350, in that the acts violated customary international law prohibiting arbitrary arrest and prolonged arbitrary detention as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

147.    As a result of Respondents' unlawful conduct, Petitioner has been and is deprived of his freedom, separated from his family, and forced to suffer severe physical and mental abuse, and is therefore entitled to habeas, declaratory, and injunctive relief, and such other relief as the court may deem appropriate.

## TENTH CLAIM FOR RELIEF

### (ALIEN TORT STATUTE – ENFORCED DISAPPEARANCE)

148.    Petitioner incorporates by reference all preceding paragraphs as if set forth fully herein.

149.    By the actions described above, the Respondents directed, ordered, confirmed, ratified, and/or conspired to bring about the enforced disappearance of Petitioner in violation of

the law of nations under the Alien Tort Statute, 28 U.S.C. § 1350, in that the acts violated customary international law prohibiting enforced disappearances as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

150.   As a result of Respondents' unlawful conduct, Petitioner has been and is deprived of his freedom, separated from his family, and forced to suffer severe physical and mental abuse, and is therefore entitled to habeas, declaratory and injunctive relief and such other relief as the court may deem appropriate.

## ELEVENTH CLAIM FOR RELIEF

### (ARTICLE II OF THE UNITED STATES CONSTITUTION – UNLAWFUL DETENTION)

151.   Petitioner incorporates by reference all preceding paragraphs as if set forth fully herein.

152.   Petitioner is not, nor has he ever been, an enemy alien, lawful or unlawful belligerent, or combatant of any kind.  The Executive lacks the authority to order or direct military officials to detain civilians who are seized far from the theater of war or occupied territory or who were not "carrying a weapon against American troops on a foreign battlefield." *Hamdi v. Rumsfeld*, 542 U.S. 507, 522n.1 (2004).

153.   By the actions described above, President Bush has exceeded and continues to exceed the Executive's authority under Article II of the United States Constitution by authorizing, ordering and directing that military officials seize Petitioner and transfer him to military detention, and by authorizing and ordering his continued military detention at Guantánamo.  All of the Respondents acted and continue to act without lawful authority by directing, ordering, and/or supervising the seizure and military detention of Petitioner.

154.    The military seizure and detention of Petitioner by the Respondents is *ultra vires* and illegal because it is in violation of Article II of the United States Constitution.  To the extent that the Executive asserts that Petitioner's detention is authorized by the Executive Order, that Order exceeds the Executive's authority under Article II and is *ultra vires* and void on its face and as applied to Petitioner.

155.    To the extent that Respondents assert that their authority to detain Petitioner derives from a source other than the Executive Order, including without limitation the Executive's inherent authority to conduct foreign affairs or to serve as Commander-in-Chief of the U.S. Armed Forces, whether from Article II of the Constitution or otherwise, Respondents lack that authority as a matter of fact and law.

156.    Accordingly, Petitioner is entitled to habeas, declaratory, and injunctive relief, as well as any other relief the court may deem appropriate.

## TWELFTH CLAIM FOR RELIEF

### (VIOLATION OF THE APA – ARBITRARY AND CAPRICIOUS UNLAWFUL DETENTION)

157.    Petitioner incorporates by reference all preceding paragraphs as if set forth fully herein.

158.    Army Regulation 190-8 prohibits the detention of civilians who were seized away from the field of battle or outside occupied territory or who were not engaged in combat against the United States.  *See, e.g.*, Army Reg. 190-8 at 1-6(g) ("Persons who have been determined by a competent tribunal not to be entitled to prisoner of war status may not be executed, imprisoned, or otherwise penalized without further proceedings to determine what acts they have committed and what penalty should be imposed.").

159.    By arbitrarily and capriciously detaining Petitioner in military custody for over four years in the manner described above, Respondents have acted and continue to act *ultra vires* and unlawfully in violation of the Administrative Procedures Act, 5 U.S.C. § 706(2).

160.    Accordingly, Petitioner is entitled to habeas, declaratory, and injunctive relief, as well as any other relief the court may deem appropriate.

## THIRTEENTH CLAIM FOR RELIEF

### (VIOLATION OF THE APA – ARBITRARY AND CAPRICIOUS DENIAL OF DUE PROCESS)

161.    Petitioner incorporates by reference all preceding paragraphs as if set forth fully herein.

162.    By the actions described above, Respondents, acting under color of law, have arbitrarily and capriciously denied and continue to deny Petitioner the process accorded to persons seized and detained by the United States military in times of armed conflict as established by Army Regulation 190-8 in violation of the Administrative Procedures Act, 5 U.S.C. § 706(2).

163.    Accordingly, Petitioner is entitled to habeas, declaratory, and injunctive relief, as well as any other relief the court may deem appropriate.

## FOURTEENTH CLAIM FOR RELIEF

### (VIOLATION OF THE APA – TORTURE AND CRUEL, INHUMAN OR DEGRADING TREATMENT)

164.    Petitioner incorporates by reference all preceding paragraphs as if set forth fully herein.

165.    By the actions described above, the Respondents have acted and continue to act arbitrarily and capriciously by directing, ordering, confirming, ratifying, and/or conspiring to

unlawfully subject Petitioner to torture and/or cruel, inhuman or degrading treatment in violation of Army Regulation 190-8 and the Administrative Procedures Act, 5 U.S.C. § 706(2).

166.    Accordingly, Petitioner is entitled to declaratory and injunctive relief, as well as any other relief the court may deem appropriate.

## FIFEENTH CLAIM FOR RELIEF

### (FIFTH AND SIXTH AMENDMENTS TO THE UNITED STATES CONSTITUTION - VIOLATION OF THE RIGHT TO COUNSEL AND TO ACCESS TO THE COURTS)

167.    Petitioner incorporates by reference all preceding paragraphs as if set forth fully herein.

168.    Respondents, purportedly acting from a concern for national security, consistently have contrived to intrude upon Petitioner's right to consult with counsel by conditioning counsel's access to Petitioner on unreasonable terms, including classification/declassification procedures, all in violation of Petitioner's attorney-client privilege, his work product privilege, and the Fifth and Sixth Amendments to the U.S. Constitution.

169.    Accordingly, Petitioner is entitled to habeas, declaratory, and injunctive relief, as well as any other relief the court may deem appropriate.

## SIXTEENTH CLAIM FOR RELIEF

### (28 U.S.C. § 1651, CONVENTION AGAINST TORTURE, INTERNATIONAL COVENANT ON CIVIL AND POLITICAL RIGHTS, THIRD AND FOURTH GENEVA CONVENTIONS, DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT – RENDITION)

170.    Petitioner incorporates by reference all preceding paragraphs as if set forth fully herein.

171.    Petitioner is at risk of being rendered, expelled or returned without lawful procedures to a country where he would be at risk of torture or persecution. This Court has inherent power and jurisdiction under 28 U.S.C. § 1651, in aid of its own jurisdiction, to address

the potential rendition or transfer of Petitioner. Additionally, the transfer of the Petitioner to a country that creates a foreseeable and direct risk that he will be subjected to torture constitutes a violation of Petitioner's rights under the Convention Against Torture, International Covenant on Civil and Political Rights, Third and Fourth Geneva Conventions, and the Due Process Clause of the Fifth Amendment to the United States Constitution.

172. Accordingly, Petitioner is entitled to declaratory and injunctive relief, as well as any other relief the court may deem appropriate.

## VI.
## PRAYER FOR RELIEF

WHEREFORE, Petitioner prays for relief as follows:

1. Grant the Writ of Habeas Corpus and order Respondents to release Petitioner from his current unlawful detention;

2. Order that Petitioner be brought before the Court or before a Magistrate Judge assigned by the Court at a convenient facility to conduct proceedings under the supervision of the Court to vindicate his rights;

3. Order that Petitioner cannot be transferred to any other country without the specific, written agreement of Petitioner and/or Petitioner's counsel while this action is pending;

4. Order that Petitioner cannot be delivered, returned, or rendered to a country where there is a foreseeable and imminent risk that Petitioner will be subject to torture;

5. Order Respondents to allow counsel immediately to meet and confer with Petitioner, in private and unmonitored attorney-client conversations;

6. Order Respondents to cease all interrogations of Petitioner, direct or indirect, while this litigation is pending;

7.    Order Respondents to cease all acts of torture; cruel, inhuman and degrading treatment; and outrages upon the personal dignity of Petitioner;

8.    Order and declare the Executive Order of November 13, 2001 is *ultra vires* and unlawful in violation of Article II of the United States Constitution, the Fifth Amendment to the United States Constitution, the Uniform Code of Military Justice, the Administrative Procedures Act, 5 U.S.C. § 702, federal common law, the treaties of the United States and customary international law;

9.    Order and declare that the prolonged, indefinite, and restrictive detention of Petitioner without due process is arbitrary and unlawful and a deprivation of liberty without due process in violation of common law principles of due process, the Due Process Clause of the Fifth Amendment to the United States Constitution, the regulations of the United States military, the treaties of the United States, and customary international human rights and humanitarian law; and

10.    Grant such other relief as the Court may deem necessary and appropriate to protect Petitioner's rights under the common law, the United States Constitution, federal statutory law and international law.


Dated: New York, New York
       June 26, 2008


                              Respectfully submitted,

                              Counsel for Petitioners:



                              Emilou MacLean
                              J. Wells Dixon
                              Pardiss Kebriaei
                              CENTER FOR CONSTITUTIONAL RIGHTS

666 Broadway, 7th Floor
New York, New York 10012
Tel: (212) 614-6461
Fax: (212) 614-6499

## <u>CERTIFICATION OF REPRESENTATION WITHOUT COMPENSATION</u>

Counsel for Petitioner hereby certify, pursuant to L. Cv. R. 83.2(g), that they are

representing Petitioner without compensation.

Dated: New York, New York
   June 26, 2008

                Emilou MacLean
                J. Wells Dixon
                Pardiss Kebriaei
                CENTER FOR CONSTITUTIONAL RIGHTS
                666 Broadway, 7th Floor
                New York, New York 10012
                Tel: (212) 614-6461
                Fax: (212) 614-6499

## CERTIFICATE OF SERVICE

I hereby certify that I caused a true and correct copy of the foregoing Petition of UN Mandate Refugee for Writ of Habeas Corpus and Other Relief to be filed and served on counsel listed below by causing an original and six copies to be delivered to the Court Security Office via overnight mail. Counsel for Respondents has agreed to accept service of this Petition on behalf of all Respondents.

Terry M. Loeb, Esq.
Senior Trial Counsel
Civil Division, Federal Programs Branch
U.S. Department of Justice
20 Massachusetts Avenue, N.W.
Washington, DC 20530

Counsel for Respondents

_____
Emilou MacLean

# Exhibit 1



**Department of Defense**
**Director, Combatant Status Review Tribunals**

OARDEC/Ser: 8 5 0

2 9 JAN 2005

~~FOR OFFICIAL USE ONLY~~

From: Director, Combatant Status Review Tribunal

Subj: **REVIEW OF COMBATANT STATUS REVIEW TRIBUNAL FOR DETAINEE ISN # 567**

Ref: (a) Deputy Secretary of Defense Order of 7 July 2004
(b) Secretary of the Navy Order of 29 July 2004

1. I concur in the decision of the Combatant Status Review Tribunal that Detainee ISN # 567 meets the criteria for designation as an Enemy Combatant, in accordance with references (a) and (b).

2. This case is now considered final and the detainee will be scheduled for an Administrative Review Board.

J. M. McGARRAH
RADM, CEC, USN

Distribution:
NSC ███████████
DoS (Ambassador Prosper)
DASD-DA
JCS (J5)
SOUTHCOM (CoS)
COMJTFGTMO
OARDEC (Fwd)
CITF Ft Belvoir

UNCLASSIFIED

25 Jan 05

MEMORANDUM

From: Assistant Legal Advisor
To:   Director, Combatant Status Review Tribunal
Via:  Legal Advisor ▪▪▪

Subj:  LEGAL SUFFICIENCY REVIEW OF COMBATANT STATUS REVIEW TRIBUNAL
       FOR DETAINEE ISN # 567

Ref:   (a) Deputy Secretary of Defense Order of 7 July 2004
       (b) Secretary of the Navy Implementation Directive of 29 July 2004

Encl:  (1) Appointing Order for Tribunal # 15 of 12 October 2004
       (2) Cherry/Paradiso email series dtd 17 November 2004
       (3) Record of Tribunal Proceedings

1. Legal sufficiency review has been completed on the subject Combatant Status Review
Tribunal in accordance with references (a) and (b). After reviewing the record of the Tribunal, I
find that:

    a. The detainee was properly notified of and actively participated in the Tribunal process.
The detainee provided a sworn oral statement at the Tribunal hearing.

    b. The Tribunal was properly convened and constituted by enclosure (1).

    c. The Tribunal substantially complied with all provisions of references (a) and (b).
Note that some information in exhibits R-5 and R-7 was redacted. The FBI properly
certified in exhibit R-2 that the redacted information would not support a determination
that the detainee is not an enemy combatant. Additionally, information in exhibits R-6,
R-16, and R-17 has been redacted. It is clear that the redacted information consists of
portions of Internment Serial Numbers (ISNs) and classification marks and that the
redacted information would not support a determination that the detainee is not an enemy
combatant.

    Enclosure (1) to the Tribunal Decision Report incorrectly refers to the hearing tribunal as
Tribunal # 5. In fact, Tribunal #15 conducted the hearing. This clerical error does not
affect the legal sufficiency of the hearing and no corrective action is needed.

    d. The Personal Representative Comments section of exhibit D-a states that "[t]his
detainee actually went to a Tribunal once before, which was recessed early in the
proceedings because the detainee said he didn't know he could call witnesses." The
Assistant Legal Advisor was contacted and he spoke to the Personal Representative who
indicated that the statement was an error. The detainee's witness request was made at his

UNCLASSIFIED

**000002**

UNCLASSIFIED

Subj:  LEGAL SUFFICIENCY REVIEW OF COMBATANT STATUS REVIEW TRIBUNAL
FOR DETAINEE ISN # 567

final interview with his Personal Representative.  The Tribunal did not start and then
recess.  (*See* e-mail dated 17 November 2004).  This was a clerical error that should have
been noted in the Tribunal Decision Report.  However, neither the clerical error, nor the
administrative error in failing to note it, affects the legal sufficiency of the exhibit or the
Tribunal Decision Report.  The detainee was not prejudiced.  No corrective action is
required.

e.  The detainee stated during the hearing that he had been tortured while in custody in
Afghanistan.  (*See* page 5, enclosure (3) of the Tribunal Decision Report).  While not
reflected in the Tribunal Decision Report, this allegation has been reported.  No further
action is required.

f.  The detainee requested three witnesses, all of whom were detainees.  The Tribunal
President determined that all three witnesses were relevant.  One of the witnesses
declined to participate in the proceeding.  Under the circumstances, the Tribunal
President determined that the witness was not reasonably available.  In my opinion, this
decision was not an abuse of discretion.  The detainee later withdrew the request for the
other two witnesses after he was informed of their expected testimony by his Personal
Representative who had previously interviewed the witnesses.

The detainee did not request any other witnesses or evidence.

g.  The Tribunal's decision that detainee # 567 is properly classified as an enemy
combatant was unanimous.

2.  The proceedings and decision of the Tribunal as reflected in enclosure (3) are legally
sufficient and no corrective action is required.

3.  I recommend that the decision of the Tribunal be approved and the case be considered final.

BREE A. ERMENTROUT
CDR, JAGC, USNR

2
UNCLASSIFIED

000003

█████████████ **(OARDEC)**

**From:**
**Sent:**        ████ Wednesday, November 17, 2004 3:58 PM
**To:**
**Subject:**        RE: test test

Classification: U N C L A S S I F I E D
Caveats: ████

Sir,

Below is what I sent you yesterday. Thanks for the help w/ the ████.

V/R

Not as beat down ████ (but still angry)

-----Original Message-----
From: █████████████████
Sent: Wednesday, November 17, 2004 3:44 PM
To: ████████████████
Subject: test test

Sir,

Attached is the PR's response to our 567 question. This was his first
tribunal and he made a mistake. He's a really good PR besides this
mistake.
Let me know if you need anything else. Thanks, Sir.

V/R

████

████████

The Detainee Election Form is incorrect.  The request for witnesses came
at
the final interview not at the tribunal.

I apologize for the error on the DEF - it is my fault.

567's "final" interview (where he requested witnesses) was 12 Oct 04.

Classification: U N C L A S S I F I E D
Caveats: ████


Classification: U N C L A S S I F I E D
Caveats: ████

1

**000004**



Department of Defense
Director, Combatant Status Review Tribunals

12 Oct 04

From:  Director, Combatant Status Review Tribunals

Subj:  APPOINTMENT OF COMBATANT STATUS REVIEW TRIBUNAL #15

Ref:  (a) Convening Authority Appointment Letter of 9 July 2004

By the authority given to me in reference (a), a Combatant Status Review Tribunal established by "Implementation of Combatant Status Review Tribunal Procedures for Enemy Combatants Detained at Guantanamo Bay Naval Base, Cuba" dated 29 July 2004 is hereby convened.  It shall hear such cases as shall be brought before it without further action of referral or otherwise.

The following commissioned officers shall serve as members of the Tribunal:

MEMBERS:

███████████████, Colonel, U.S. Air Force; President

███████████████ Lieutenant Colonel, U.S. Air Force; Member
(JAG)

███████████████ Lieutenant Commander, U.S. Navy; Member

J. M. McGARRAH
Rear Admiral
Civil Engineer Corps
United States Navy

**000005**



# HEADQUARTERS, OARDEC FORWARD
## GUANTANAMO BAY, CUBA
### APO AE 09360

11 November 2004

MEMORANDUM FOR DIRECTOR, CSRT

FROM: OARDEC FORWARD Commander

SUBJECT: CSRT Record of Proceedings ICO ISN# 567

1. Pursuant to Enclosure (1), paragraph (I)(5) of the *Implementation of Combatant Status Review Tribunal Procedures for Enemy Combatants Detained at Guantanamo Bay Naval Base, Cuba* dated 29 July 2004, I am forwarding the Combatant Status Review Tribunal Decision Report for the above mentioned ISN for review and action.

2. If there are any questions regarding this package, point of contact on this matter is the undersigned at DSN ▮▮▮▮▮.

CHARLES E. JAMISON
CAPT, USN

**000006**

~~SECRET//NOFORN~~//X1

### (U) Combatant Status Review Tribunal Decision Report Cover Sheet

(U) This Document is UNCLASSIFIED Upon Removal of Enclosures (2) and (4).

(U) TRIBUNAL PANEL:  __#15__

(U) ISN#:  ___567___

Ref:   (a) (U) Convening Order for Tribunal #15 of 12 October 2004] (U)
     (b) (U) CSRT Implementation Directive of 29 July 2004 (U)
     (c) (U) DEPSECDEF Memo of 7 July 2004 (U)

Encl:  (1) (U) Unclassified Summary of Basis for Tribunal Decision (U/~~FOUO~~)
     (2) (U) Classified Summary of Basis for Tribunal Decision (~~S/NF~~)
     (3) (U) Summary of Detainee/Witness Testimony (U/~~FOUO~~)
     (4) (U) Copies of Documentary Evidence Presented (~~S/NF~~)
     (5) (U) Personal Representative's Record Review (U/~~FOUO~~)

1. (U) This Tribunal was convened by references (a) and (b) to make a determination as to whether the detainee meets the criteria to be designated as an enemy combatant as defined in reference (c).

2. (U) On 29 Oct 2004 the Tribunal determined, by a preponderance of the evidence, that Detainee #567 is properly designated as an enemy combatant as defined in reference (c).

3. (U) In particular, the Tribunal finds that this detainee is a member of, or affiliated with, al Wafa and al Qaida, as more fully discussed in the enclosures.

4. (U) Enclosure (1) provides an unclassified account of the basis for the Tribunal's decision. A detailed account of the evidence considered by the Tribunal and its findings of fact are contained in enclosures (1) and (2).



Tribunal President

DERV FM: Multiple Sources
DECLASS: XI

~~SECRET//NOFORN~~//X1

**000007**

UNCLASSIFIED//~~FOUO~~

# UNCLASSIFIED SUMMARY OF BASIS FOR TRIBUNAL DECISION

### (Enclosure (1) to Combatant Status Review Tribunal Decision Report)

TRIBUNAL PANEL: _____ #5 ____

ISN #: _____ 567 ____

## 1. Introduction

As the Combatant Status Review Tribunal (CSRT) Decision Report indicates, the Tribunal has determined that this detainee is properly classified as an enemy combatant and is a member of, or affiliated with, al Wafa and al Qaida. In reaching its conclusions, the Tribunal considered both classified and unclassified information. The following is an account of the unclassified evidence considered by the Tribunal and other pertinent information. Classified evidence considered by the Tribunal is discussed in Enclosure (2) to the CSRT Decision Report.

## 2. Synopsis of Proceedings

The unclassified summary of the evidence presented to the Tribunal by the Recorder indicated that the detainee supported forces engaged in hostilities against the United States and its coalition partners in that he was a member of the al Wafa organization. The detainee chose to participate in the Tribunal process. He requested three witnesses, requested no documents be produced, and made a sworn verbal statement. The Tribunal President found one of the requested witnesses not reasonably available, and that alternative means of producing the witness's testimony were also not reasonably available. The President found the other two witnesses relevant, but the detainee withdrew his request for these witnesses prior to his hearing. The detainee, in his verbal statement, denied being a member of al Wafa and claimed that if he had admitted to being an al Wafa member in the past it was because he had been tortured while in custody in Afghanistan. He further claimed that he was simply an employee of a legitimate company known as the Dahabshiil Money Transfer Company. The detainee's allegations of torture were forwarded to the appropriate authorities, in accordance with CSRT policy. The Tribunal President's witness rulings are explained below.

## 3. Evidence Considered by the Tribunal

The Tribunal considered the following evidence in reaching its conclusions:

    a. Exhibits: D-a through D-b and R-1 through R-17.

    c. Sworn statement of the detainee.

UNCLASSIFIED//~~FOUO~~

UNCLASSIFIED//~~FOUO~~

**4. Rulings by the Tribunal on Detainee Requests for Evidence or Witnesses**

The Detainee requested the following witnesses be produced for the hearing:

| Witness | President's Decision | Testified? |
|---|---|---|
| GTMO Detainee #005 | not reasonably available | no* |
| GTMO Detainee #568 | relevant | no* |
| GTMO Detainee #577 | relevant | no* |

* The Tribunal President found that these three witnesses would be relevant to the Tribunal, and approved them. The Personal Representative (PR) then interviewed Detainees #568 and #577 and attempted to interview Detainee #005. Detainee #005 refused to speak to the PR and indicated that he was not willing to speak to anyone about this case. The Tribunal President then found him not reasonably available to testify. After interviewing Detainees #568 and #577, the PR discussed the interviews with Detainee #567. After hearing what these detainees were expected to say, the detainee withdrew his request to have these individuals testify at his tribunal.

**5. Discussion of Unclassified Evidence**

The Tribunal considered the following unclassified evidence in making its determinations:

a. The recorder offered Exhibits R-1 through R-3 into evidence during the unclassified portion of the proceeding. Exhibit R-1 is the Unclassified Summary of Evidence. While this summary is helpful in that it provides a broad outline of what the Tribunal can expect to see, it is not persuasive in that it provides conclusory statements without supporting unclassified evidence. Exhibit R-2 provided no usable evidence. Exhibit R-3 is a reproduction of Executive Order #13224. For the most part, the Tribunal had to look to classified exhibits for support of the Unclassified Summary of Evidence.

b. Essentially the only unclassified evidence the Tribunal had to consider was the detainee's sworn testimony and Exhibit D-b, which provided the Tribunal with information regarding the Dahabshiil Corporation. A summarized transcript of the detainee's sworn testimony is attached as CSRT Decision Report Enclosure (3). In sum, the detainee testified that he left Somalia in 1994 to escape civil war and seek employment. He moved to Pakistan and eventually got a job with the Dahabshiil Company. This company, he explained, is similar to a bank, and conducts money transfers for people that don't have access to a conventional bank. He said that all the transactions he conducted were in the course of his business, and that he had no

UNCLASSIFIED//~~FOUO~~

knowledge of conducting transfers for al Wafa. He repeatedly maintained his innocence and claimed that he has been wrongly accused of supporting terrorism.

The Tribunal also relied on certain classified evidence in reaching its decision. A discussion of the classified evidence is found in Enclosure (2) to the Combatant Status Review Tribunal Decision Report.

### 6. Consultations with the CSRT Legal Advisor

No issues arose during the course of this hearing that required consultation with the CSRT legal advisor.

### 7. Conclusions of the Tribunal

Upon careful review of all the evidence presented in this matter, the Tribunal makes the following determinations:

    a. The detainee was mentally and physically capable of participating in the proceeding. No medical or mental health evaluation was deemed necessary.

    b. The detainee understood the Tribunal proceedings. He indicated that he understood the proceedings, fully participated in his hearing, asked relevant questions, and provided helpful information during his sworn statement.

    c. The detainee is properly classified as an enemy combatant and is a member of, or affiliated with, al Wafa and al Qaida.

### 8. Dissenting Tribunal Member's report

None. The Tribunal reached a unanimous decision.

Respectfully submitted,



Tribunal President

UNCLASSIFIED//~~FOUO~~

**UNCLASSIFIED / ~~FOUO~~**

**<u>Summarized Sworn Detainee Statement</u>**

When asked by the Tribunal President if the detainee understood the CSRT process, the Detainee answered, "Yes."

[The Tribunal President made the following comments regarding the previous witness request by the Detainee:]

Tribunal President:  The Detainee had previously requested three witnesses.

Detainee:  Yes.

Tribunal President:  One of the three witnesses refused to testify.

Detainee:  Who refused?

Tribunal President:  He is referenced in the request as Detainee 005.  I rule because he did not wish to testify, he is not reasonably available.

Detainee:  He refused or was he prohibited?

Tribunal President:  He refused to see us.  The other two witnesses were willing to testify, but I understand that you withdrew your request for them to be here and provide testimony.  Is that correct?

Detainee:  My Personal Representative told me after he had met with my two witnesses, they told him they were not with the al-Wafa organization.  When I was talking to investigators they told me the two Detainees were from the al-Wafa organization, but after the Personal Representative asked them and they said they were not from al-Wafa then they would have no value in testifying for me.

Tribunal President:  There will be no witnesses at this hearing today.

[After taking the Muslim Oath, the Detainee made the following statement]:

Detainee:  The first accusation that I traveled from my country voluntarily to Pakistan in 1994.  There was a civil war inside Somalia and anyone who wanted to leave Somalia was able to.  Whoever was capable of leaving, they left.  Several Somalians left and are now living in the United States, Europe, and other countries.  I left the country because of the continuing civil war.  The places I was allowed to go was one of the countries I mentioned before.  I don't understand what you mean by voluntarily leaving my country.

I will ask the President, is leaving the country because of civil wars a crime?

**UNCLASSIFIED / ~~FOUO~~**

**UNCLASSIFIED / ~~FOUO~~**

Tribunal President: We are not here on a criminal case. We just want to understand what may make you an enemy combatant. Moving from one country to another in itself does not make you an enemy combatant. It was why you left the country is something we can consider and we appreciate your statement on that fact.

Detainee: I lived in the North of Somalia, it is now independent, but not believed by other countries to be a country. It is called the Republic of Somalia. Before Somalia was reunited it was called North West Somalia. That is the area I left and it was the first area to start a civil war in 1978 or 1988. During that time, I was studying at the University of Agriculture that was close to Mogadishu. My family lived in the area where the civil war was. I was completely cut off from my family. I continued my studies in a difficult situation. During that time the Somalian government was headed by President Mohammed Said Budee. He was a dictator and several people suffered under that dictator. While I was studying at the University, I was cutoff from my family. The war continued until I finished my studies, then the war spread to all of Somalia. The last area the war started was the capital of Somalia. That is where the President was located.

Previously, the war was between the North and the Army, then the war turned into a Tribal war. After the war started in the Capital, everyone had to return to where they were from. I went to my neighborhood, the North area. After the government and Capital fell, the North entered the battle they were fighting against the government. They announced their independence from the rest of Somalia, but up until now the war continues. The continuing war forced me to leave my country. I wanted to seek a safer place to live. I was hoping to go to a country, such as the Gulf countries, Europe, or the United States where I could find a job. I was unable to financially. My family suffered through the war. They were unable to support me. I was capable of going to India then on to Pakistan. My goal wasn't to stay in that country. I wanted to go to an economical country such as Europe or the United States. Several Somalians went to those countries. As I mentioned before, that is the reason I went to Pakistan.

I left the country under the United Nations umbrella. I was a refugee in Pakistan. Life there was very difficult and help from the United Nations was limited. It was hard to find work because jobs were limited. I arrived in Pakistan in 1994 via India. I forgot to mention earlier, that I went from the North of Somalia to India and from India to Pakistan. I have been telling this story for three years now. Since so much time has passed, I may have missed some steps because I can't remember. I was able to become a refugee and got help. Without help, how could you live there?

I lived there until 1995 and then went to Karachi. I found a job, but it wasn't stable. It involved people who wanted a translator for real estate. It was similar to a social real estate worker.

Regarding the second point, I got a job at the Dehabshiil Company. The Dehabshiil Company is a company that transfers money similar to a bank. During the war, whatever Somalians got from the government ended there. The civil wars caused several people to

ISN #567
Enclosure (3)
Page 2 of 8

**UNCLASSIFIED / ~~FOUO~~**

**000014**

**UNCLASSIFIED /~~FOUO~~**

flee the country. This Dehabshiil company helped transfer money to those people that needed it, especially those who couldn't use banks. There are no banks in Somalia. Dehabshiil is a large company, with several branches all over the world especially in places were there are a lot of Somalian people. It is a well-known international company and you can find out any information about it on it's website. My office was just like all the other offices. My name and address is on their website and anyone with internet access was capable of getting in contact with me. My job was to receive the money and transfer it to students and families who needed it in Somalia. The people in Somalia were not there to work and they weren't capable of transferring a lot of money, however their families were capable of sending them money. This money was transferred directly to the main office in Somalia. That was the work I did for the company. It was the same work the other agents did, including the agents in the United States.

I want to thank my Personal Representative. When I provided him with this information he honestly went on the internet into Dehabshiil's website and downloaded important information. He promised he would present it in the Tribunal. Hopefully you will see it.

[Detainee asked Personal Representative if he would like to present the information from the internet.]

Tribunal President: I would like to get through your statement first. There will be a place where we will ask for additional evidence.

Detainee: Good.

[Detainee continued statement:]

The information you receive from the Personal Representative will show you that the Dehabshiil is a clean company and does clean work. If they weren't, they wouldn't have offices in the United States.

The third point [referring to the Unclassified Summary of Evidence] is not one hundred percent correct. It is an exaggeration. I never heard of the al-Wafa organization until I entered the prison in Pakistan and I have never worked for them. The people that interrogated me for the last three years know this. It appears they didn't tell the truth when those accusations were presented. I wasn't arrested in the streets or mountains but inside my home, where I also worked. My office was inside of my house. All of the equipment I used for the Dehabshiil Company was in my house. I had a computer, files, books, fax machine, and a telephone. Everything I needed was in my house. After I was arrested at my house, you should have had enough evidence to show whether or not I was connected to al-Wafa. All the accusations against me are based on some telephone numbers found on a list. As I have mentioned before, my work at Dehabshiil has a website on the internet and anyone can access that website. My name and phone number was popular on that page. I would get several calls a day, some were from people I knew and some weren't. The accusations against me are based on those phone numbers.

ISN #567
Enclosure (3)
Page 3 of 8

**UNCLASSIFIED /~~FOUO~~**

**UNCLASSIFIED / ~~FOUO~~**

The interrogators told me the members were with them when the accusations were made about me. I told interrogators if all of the members are here they can testify and the truth well come out. They might have told the truth, only God knows. I heard the guy who was the President of the organization was at Camp 5. My Personal Representative told me that the President of the Tribunal refused the witness because that person refused to talk to my Personal Representative. I'm not surprised, a lot of people are sick of talking after all this time.

I just wanted to ask the witness if I was from his organization or not. It didn't concern him it concerned me. This person matters because he is the President and he would know who is in his organization and who wasn't. That was a very important point for me but it was laziness on your part.

If it were possible to bring that witness with a Translator and my Personal Representative and if that person could have testified that would have been enough. One of the other witnesses phone number was found on one of the lists of phone numbers that Al Allah was accused of getting in contact with al-Wafa with. Investigators told me he was from the al-Wafa organization and because of the phone call that is why I was accused of being with al-Wafa. That is why I wanted him to testify.

When my Personal Representative came back and told me the witnesses were denying they were from the al-Wafa organization, I told myself how can they testify? All the accusations against me are unjust. I am innocent of them all.

Here is a summary of my story from the day I was arrested until the day I got here. I was arrested in my house on the first of November 2001, between 02:30 till 03:00. The Pakistani Intelligence came to my home and investigated me on three occasions. The time period between those three investigations was about three weeks. After each visit they asked me about my job, and what I did. During this time I wasn't worried because I didn't feel like I had done anything wrong. If I thought I had done anything wrong against any region or organization I wouldn't have stayed in my home until I was arrested.

When they took me to prison, I was told they were investigating me and in the morning I could go home. My wife was with me at home when I was arrested. It was just her and I in the house. No one else was with us. When I was kidnapped at 02:30 they left my family alone at the house. Up to now, I haven't learned anything about what has happened to her. I stayed at that prison for about four months. The investigators said they were Pakistani and Americans. The Pakistani's told me those English men were investigating me. They talked to me twice. The third time they brought pictures and showed them to me. During that time I was told by the Pakistanis, I was going to be released and sent home since the investigation was completed. They told me I was a suspect because of those telephone calls but because you worked for that large company (Dehabshiil) they told me it wasn't unusual to talk to so many people on the phone. They

**UNCLASSIFIED / ~~FOUO~~**

would tell me every now and then maybe I would be released to Islamabad or sent back to Somalia. After I completed four months in prison, they blindfolded me with a group that was arrested in Karachi and handed me over to the American forces. The Pakistanis told me I would go to a neighboring country. I was taken to an American base in Afghanistan. I was told the Americans would investigate me then release me. A soldier called my name only and I was put on a military airplane. It appears to me they made up the case against me. The Pakistani government is corrupt. I believe they sold me. I was taken to Kandahar, an area I'm not familiar with. I was there for about three days and an investigation was done. After three days I was taken with three other individuals from the same group that came with me from Pakistan. We were transferred to another area. I found out through the Red Cross it was Baghram. It took about twelve hours to get there. They interrogated me and one of the interrogators told me I was from al-Wafa and I needed to confess to that. You have no choice. I told them it wasn't true. They pressured me. They were whispered something then spoke to the guard. The guard came in, grabbed me by my neck and threw me. He took me in a bad way to isolation. All my blankets, except one, were taken from me. It was freezing cold. They didn't feed me lunch and sometimes they didn't feed me twice. At night it is very cold and if you don't eat dinner it gets colder. This torture lasted fifteen to twenty days. My feet and hands were swollen. I wasn't able to stand because I was in so much pain. I asked for treatment and an interrogator brought a nurse and asked if I wanted treatment. They told me they could cut my legs to stop the pain. They did this so I would confess to the accusations that I didn't do. Nothing happened. After the torture ended, I met another interrogator who told me injustice was done to me and I didn't have anything to do with this. He said he would do a report so I could go home. He told me I would be released. Suddenly, I was taken back to Kandahar and then to Cuba. The investigations and interrogations continue to this day and the accusation is still made against me. During the time I was here, the interrogators have never accused me of being from al-Wafa. When my Personal Representative gave me the Unclassified Summary I thought the accusation was cleared up until I saw it back on the paper.

When I was in Pakistan, the Pakistanis told me I would likely travel back to my country. They asked if I wanted to take my family with me back home. They even went to my family and asked if they wanted to go with me to our country. My father-in-law is here and he is the one who told them that they asked my wife if she wanted to go back home with me. From what he heard they were serious. What changed since then?

For example, if they found a phone and your calling list and that phone number belonged to someone who was wanted by the authorities, would that be a crime against you? Does that prove the person that received the call worked for the person calling? Just because someone had a list with names and phone numbers it doesn't prove they were part of that organization, especially after long interrogations. I think you know and have studied the law. From where I sit, this isn't proof that I am part of that organization (al-Wafa). Do you have any other proof that shows I am part of al Wafa?

**UNCLASSIFIED / ~~FOUO~~**

Tribunal President: At this point we have the same information you have, your statement and the same unclassified information. We may receive other information at a later time that we will consider.

Detainee: With me there?

Tribunal President: Probably without you here, if it is classified. We took an Oath to promise to do our best to consider all information and based upon our judgment and the laws and regulations, we will make a determination.

Detainee: If the information is about me, I want to be there to defend myself. Maybe the interrogators wrote something that I never said or maybe something was translated incorrectly.

Tribunal President: We understand.

Detainee: If there is proof somewhere against me and I'm not there to testify, there is something missing if I can't defend myself.

Tribunal President: I understand your concerns. This is the procedure we are going through to address all the information available in your case.

Detainee: God is well everything is (inaudible).

### Summarized Answers in Response to Questions by the Tribunal Members:

Q:      How did you know Detainee 005 was the al-Wafa President?

A:      Since I was brought here, all the interrogations have been around Abudula Aziz, and I was told he was from al-Wafa. I was also asked if I knew him.

[Tribunal President made the following comment regarding a statement made by the Detainee.]

Tribunal President: I would like to make it clear to you that I cannot force a witness to attend your hearing. They must volunteer to come here.

Detainee: Maybe we can take the Detainee from his cell without telling him where he is going and he can be brought in to the room with me, and my Personal Representative. My Personal Representative could ask him questions and hopefully he would reply.

Tribunal President: I understand but the administrative process we have does not permit that.

**UNCLASSIFIED / ~~FOUO~~**

[The Personal Representative presented additional evidence {D-b} from the Dehabshiil's website to the Tribunal and made the following comment.]

Personal Representative: This is information from the Dehabshiil's website. It gives some information about the company, what the company does, and it also shows there are branches around the world, including the United States. It also gives a Due Diligence policy with regards to money transfers post 11 September.

Tribunal President: I would like to ask the Detainee a question about the Due Diligence Policy.

**Summarized Answers in Response to Questions by the Tribunal Members:**

Q:     Were you aware of the Due Diligence Policy after the 11 September attacks?

[A Tribunal member explained due diligence and the policy of the Dehabshiil Company to the Translator (by reading from Exhibit D-b) to ensure an accurate translation.]

[Tribunal President changed his question to the following:]

Q:     Did you received training on "Know Your Customer" procedures?

A:     No, I never received the training. The orders usually came to me via the fax machine. This must of happened while I was in prison. My work was very simple my office was very small.

Q:     Do you remember the name of your supervisor?

A:     The owner of the company Mohammed Said.

Personal Representative: That information is on the first page of exhibit D-b.

Q:     What was the name of your immediate supervisor, the person you reported and received payment for working?

A:     The President, but there were other managers and their names are in that paper (Ex D-b). I don't remember their names. The main office is in the neighborhood north of Somalia. I called directly through the fax.

[The Tribunal was recessed to remove the Detainee from the room.]

UNCLASSIFIED / ~~FOUO~~

## AUTHENTICATION

I certify the material contained in this transcript is a true and accurate summary of the testimony given during the proceedings.



Tribunal President

ISN #567
Enclosure (3)
Page 8 of 8

**000020**

UNCLASSIFIED//~~FOUO~~

# DETAINEE ELECTION FORM

**Date:** 26 Oct 04

**Start Time:** 1500

**End Time:** 1545

ISN#: 567

Personal Representative: ████████████ MAJOR, USAF
(Name/Rank)

Translator Required? YES          Language? ARABIC

CSRT Procedure Read to Detainee or Written Copy Read by Detainee? NO

**Detainee Election:**

[X]    **Wants to Participate in Tribunal**

[ ]    **Affirmatively Declines to Participate in Tribunal**

[ ]    **Uncooperative or Unresponsive**

**Personal Representative Comments:**

Detainee wants to make an oral statement.

Detainee originally requested three witnesses (005, 568, 577), but has since withdrawn his request

for 577 and 568.  005 refused to talk to the PR.


Note: This detainee actually went to a tribunal once before, which was recessed early in the

proceedings because the detainee said he didn't know he could call in-camp witnesses.  The

tribunal president recessed the tribunal and asked the PR to get the witness request from the

detainee.  This was done and 2 of the 3 witnesses were interviewed by the PR.  The third witness

said he would not talk to the PR or anybody else.  After reviewing the witnesses' comments

regarding the detainee (567), the detainee decided not to call them for his tribunal.



Personal Representative: ████████████

UNCLASSIFIED//~~FOUO~~

**000021**

*Exhibit D-a*

UNCLASSIFIED

**Combatant Status Review Board**

TO: Tribunal Members

FROM: OIC, CSRT (29 September 2004)

Subject: Summary of Evidence for Combatant Status Review Tribunal – BARRE, Mohammed Sulaymon.

1. Under the provisions of the Secretary of the Navy Memorandum, dated 29 July 2004, *Implementation of Combatant Status Review Tribunal Procedures for Enemy Combatants Detained at Guantanamo Bay Naval Base Cuba*, a Tribunal has been appointed to review the detainee's designation as an enemy combatant.

2. An enemy combatant has been defined as "an individual who was part of or supporting the Taliban or al Qaida forces, or associated forces that are engaged in hostilities against the United States or its coalition partners. This includes any person who committed a belligerent act or has directly supported hostilities in aid of enemy armed forces."

3. The United States Government has previously determined that the detainee is an enemy combatant. This determination is based on information possessed by the United States that indicates that he supported forces engaged in hostilities against the United States and its coalition partners.

The detainee supported forces engaged in hostilities against the United States and its coalition partners.

   1. The detainee voluntarily moved from Somalia to Pakistan in 1994.

   2. The detainee worked for the Dehabshiil Company in Karachi, Pakistan.

   3. The detainee was identified as a member of the non-governmental organization al Wafa.

   4. Al Wafa is listed as a terrorist organization on Executive Order 13224.

4. The detainee has the opportunity to contest his designation as an enemy combatant. The Tribunal will endeavor to arrange for the presence of any reasonably available witnesses or evidence that the detainee desires to call or introduce to prove that he is not an enemy combatant. The Tribunal President will determine the reasonable availability of evidence or witnesses.

**000023**  1 of 1

Exhibit R-1

**Memorandum**    UNCLASSIFIED    

| | | | |
|---|---|---|---|
| To | : | Department of Defense<br>Office of Administrative Review<br>for Detained ████ Combatants<br>Col. ████████ | Date 09/28/2004 |
| From | : | FBI GTMO<br>Counterterrorism Divisio█<br>Asst. Gen. ████████ | |
| Subject | | REQUEST FOR REDACTION OF<br>NATIONAL SECURITY INFORMATION<br>████ 00567█ | |

Pursuant to the Secretary of the Navy Order of 29 July 2004, Implementation of Combatant Review Tribunal Procedures for Enemy Combatants Detained at Guantanamo Bay Naval Base, Cuba, Section D, paragraph 2, the FBI requests redaction of the information herein marked[1]. The FBI makes this request on the basis that said information relates to the national security of the United States[2]. Inappropriate dissemination of said information could damage the national security of the United States and compromise ongoing FBI investigations.

CERTIFICATION THAT REDACTED INFORMATION DOES NOT SUPPORT A DETERMINATION THAT THE DETAINEE IS NOT AN ENEMY COMBATANT

The FBI certifies the aforementioned redaction contains no information that would support a determination that the detainee is not an enemy combatant.

The following documents relative to ISN 567 have been redacted by the FBI and provided to the OARDEC:

FD-302 dated 05/22/2002
FD-302 dated 12/17/2002

[1]Redactions are blackened out on the OARDEC provided FBI document.

[2]See Executive Order 12958

000024    f of

UNCLASSIFIED

Memorandum from ███████████████████████
Re:  REQUEST FOR REDACTION, 09/28/2004

If you need additional assistance, please contact Asst.
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

-2-

UNCLASSIFIED

UNCLASSIFIED

23 September 2001

# Executive Order

**Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism**

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.)(IEEPA), the National Emergencies Act (50 U.S.C. 1601 et seq.), section 5 of the United Nations Participation Act of 1945, as amended (22 U.S.C. 287c) (UNPA), and section 301 of title 3, United States Code, and in view of United Nations Security Council Resolution (UNSCR) 1214 of December 8, 1998, UNSCR 1267 of October 15, 1999, UNSCR 1333 of December 19, 2000, and the multilateral sanctions contained therein, and UNSCR 1363 of July 30, 2001, establishing a mechanism to monitor the implementation of UNSCR 1333,

I, GEORGE W. BUSH, President of the United States of America, find that grave acts of terrorism and threats of terrorism committed by foreign terrorists, including the terrorist attacks in New York, Pennsylvania, and the Pentagon committed on September 11, 2001, acts recognized and condemned in UNSCR 1368 of September 12, 2001, and UNSCR 1269 of October 19, 1999, and the continuing and immediate threat of further attacks on United States nationals or the United States constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States, and in furtherance of my proclamation of September 14, 2001, Declaration of National Emergency by Reason of Certain Terrorist Attacks, hereby declare a national emergency to deal with that threat.

I also find that because of the pervasiveness and expansiveness of the financial foundation of foreign terrorists, financial sanctions may be appropriate for those foreign persons that support or otherwise associate with these foreign terrorists.

I also find that a need exists for further consultation and cooperation with, and sharing of information by, United States and foreign financial institutions as an additional tool to enable the United States to combat the financing of terrorism.

I hereby order:

> **Section 1.** Except to the extent required by section 203(b) of IEEPA (50 U.S.C. 1702(b)), or provided in regulations, orders, directives, or licenses that may be issued pursuant to this order, and notwithstanding any contract entered into or any license or permit granted prior to the effective date of this order, all property and interests in property of the following persons that are in the United States or that hereafter come within the United States, or that hereafter come within the possession or control of United States persons are blocked:

**000026**  1 of 6

Exhibit R-3

UNCLASSIFIED

(a) foreign persons listed in the Annex to this order;

(b) foreign persons determined by the Secretary of State, in consultation with the Secretary of the Treasury and the Attorney General, to have committed, or to pose a significant risk of committing, acts of terrorism that threaten the security of U.S. nationals or the national security, foreign policy, or economy of the United States;

(c) persons determined by the Secretary of the Treasury, in consultation with the Secretary of State and the Attorney General, to be owned or controlled by, or to act for or on behalf of those persons listed in the Annex to this order or those persons determined to be subject to subsection 1(b), 1(c), or 1(d)(i) of this order;

(d) except as provided in section 5 of this order and after such consultation, if any, with foreign authorities as the Secretary of State, in consultation with the Secretary of the Treasury and the Attorney General, deems appropriate in the exercise of his discretion, persons determined by the Secretary of the Treasury, in consultation with the Secretary of State and the Attorney General;

(i) to assist in, sponsor, or provide financial, material, or technological support for, or financial or other services to or in support of, such acts of terrorism or those persons listed in the Annex to this order or determined to be subject to this order; or

(ii) to be otherwise associated with those persons listed in the Annex to this order or those persons determined to be subject to subsection 1(b), 1(c), or 1(d)(i) of this order.

Sec. 2. Except to the extent required by section 203(b) of IEEPA (50 U.S.C. 1702(b)), or provided in regulations, orders, directives, or licenses that may be issued pursuant to this order, and notwithstanding any contract entered into or any license or permit granted prior to the effective date:
(a) any transaction or dealing by United States persons or within the United States in property or interests in property blocked pursuant to this order is prohibited, including but not limited to the making or receiving of any contribution of funds, goods, or services to or for the benefit of those persons listed in the Annex to this order or determined to be subject to this order;

(b) any transaction by any United States person or within the United States that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in this order is prohibited; and

**000027**

2 of 6

UNCLASSIFIED

UNCLASSIFIED

(c) any conspiracy formed to violate any of the prohibitions set forth in this order is prohibited.

Sec. 3. For purposes of this order:

(a) the term "person" means an individual or entity;

(b) the term "entity" means a partnership, association, corporation, or other organization, group, or subgroup;

(c) the term "United States person" means any United States citizen, permanent resident alien, entity organized under the laws of the United States (including foreign branches), or any person in the United States; and

(d) the term "terrorism" means an activity that --

(i) involves a violent act or an act dangerous to human life, property, or infrastructure; and

(ii) appears to be intended --

(A) to intimidate or coerce a civilian population;

(B) to influence the policy of a government by intimidation or coercion; or

(C) to affect the conduct of a government by mass destruction, assassination, kidnapping, or hostage-taking.

Sec. 4. I hereby determine that the making of donations of the type specified in section 203(b)(2) of IEEPA (50 U.S.C. 1702(b)(2)) by United States persons to persons determined to be subject to this order would seriously impair my ability to deal with the national emergency declared in this order, and would endanger Armed Forces of the United States that are in a situation where imminent involvement in hostilities is clearly indicated by the circumstances, and hereby prohibit such donations as provided by section 1 of this order.

Furthermore, I hereby determine that the Trade Sanctions Reform and Export Enhancement Act of 2000 (title IX, Public Law 106-387) shall not affect the imposition or the continuation of the imposition of any unilateral agricultural sanction or unilateral medical sanction on any person determined to be subject to this order because imminent involvement of the Armed Forces of the United States in hostilities is clearly indicated by the circumstances.

Sec. 5. With respect to those persons designated pursuant to subsection 1(d) of this order, the Secretary of the Treasury, in the exercise of his discretion and in

**000028**

UNCLASSIFIED

3 of 6

UNCLASSIHED

consultation with the Secretary of State and the Attorney General, may take such other actions than the complete blocking of property or interests in property as the President is authorized to take under IEEPA and UNPA if the Secretary of the Treasury, in consultation with the Secretary of State and the Attorney General, deems such other actions to be consistent with the national interests of the United States, considering such factors as he deems appropriate.

**Sec. 6.** The Secretary of State, the Secretary of the Treasury, and other appropriate agencies shall make all relevant efforts to cooperate and coordinate with other countries, including through technical assistance, as well as bilateral and multilateral agreements and arrangements, to achieve the objectives of this order, including the prevention and suppression of acts of terrorism, the denial of financing and financial services to terrorists and terrorist organizations, and the sharing of intelligence about funding activities in support of terrorism.

**Sec. 7.** The Secretary of the Treasury, in consultation with the Secretary of State and the Attorney General, is hereby authorized to take such actions, including the promulgation of rules and regulations, and to employ all powers granted to the President by IEEPA and UNPA as may be necessary to carry out the purposes of this order.

The Secretary of the Treasury may redelegate any of these functions to other officers and agencies of the United States Government.

All agencies of the United States Government are hereby directed to take all appropriate measures within their authority to carry out the provisions of this order.

**Sec. 8.** Nothing in this order is intended to affect the continued effectiveness of any rules, regulations, orders, licenses, or other forms of administrative action issued, taken, or continued in effect heretofore or hereafter under 31 C.F.R. chapter V, except as expressly terminated, modified, or suspended by or pursuant to this order.

**Sec. 9.** Nothing contained in this order is intended to create, nor does it create, any right, benefit, or privilege, substantive or procedural, enforceable at law by a party against the United States, its agencies, officers, employees or any other person.

**Sec. 10.** For those persons listed in the Annex to this order or determined to be subject to this order who might have a constitutional presence in the United States, I find that because of the ability to transfer funds or assets instantaneously, prior notice to such persons of measures to be taken pursuant to this order would render these measures ineffectual. I therefore determine that for these measures to be effective in addressing the national emergency declared in this order, there need be no prior notice of a listing or determination made pursuant to this order.

**000029**

UNCLASSIFIED

4 of 6

UNCLASSIFIED

**Sec. 11.**

(a) This order is effective at 12:01 a.m. eastern daylight time on September 24, 2001.

(b) This order shall be transmitted to the Congress and published in the Federal Register.

GEORGE W. BUSH
THE WHITE HOUSE,
September 23, 2001

**ANNEX**

Al Qaida/Islamic Army

Abu Sayyaf Group

Armed Islamic Group (GIA)

Harakat ul-Mujahidin (HUM)

Al-Jihad (Egyptian Islamic Jihad)

Islamic Movement of Uzbekistan (IMU)

Asbat al-Ansar

Salafist Group for Call and Combat (GSPC)

Libyan Islamic Fighting Group

Al-Itihaad al-Islamiya (AIAI)

Islamic Army of Aden

Usama bin Laden

Muhammad Atif (aka, Subhi Abu Sitta, Abu Hafs Al Masri)

Sayf al-Adl

Shaykh Sai'id (aka, Mustafa Muhammad Ahmad)

Abu Hafs the Mauritanian (aka, Mahfouz Ould al-Walid, Khalid Al-Shanqiti)

**000030**

UNCLASSIFIED

5 of 6

UNCLASSIFIED

Ibn Al-Shaykh al-Libi

Abu Zubaydah (aka, Zayn al-Abidin Muhammad Husayn, Tariq)

Abd al-Hadi al-Iraqi (aka, Abu Abdallah)

Ayman al-Zawahiri

Thirwat Salah Shihata

Tariq Anwar al-Sayyid Ahmad (aka, Fathi, Amr al-Fatih)

Muhammad Salah (aka, Nasr Fahmi Nasr Hasanayn)

Makhtab Al-Khidamat/Al Kifah

Wafa Humanitarian Organization

Al Rashid Trust

Mamoun Darkazanli Import-Export Company

000031

TL0000

::: DAHABSHIIL :::







About Us | Press Release | Careers | FAQs | Administrator

## About Us

The Dahabshiil Pvt. Ltd. Co. was founded in Burao in 1970 by Mr. Mohamed Saeed Duale who is the sole owner of the family business with its head office in Hargeisa, Somalia.

The Dahabshiil Pvt. Ltd. Co's principal business since 1988 has been money-transfer services, together with import/export trading activities, and more recently the establishment of a postal system in Somalia , a construction company, likewise Somtel International, in which Dahabshiil is a major shareholder. Somtel International currently operates ten telecommunications stations in the country. The Dahabshiil Pvt. Ltd. Co. is the biggest private sector employer in Somalia, employing over 1,000 staff.

Dahabshiil is the oldest remittance-company in the Horn of Africa, with the largest worldwide network. It provides unparalleled money-transfer services throughout the Somali regions. The recently published research paper on remittances testifies to the leading role of Dahabshiil in remittance flows to Somali regions. The research paper published by The Journal of Disaster Studies, comments: "Dahabshiil, which has the largest network of agents, is the leading company that transfers remittances. It established its reputation as the most trusted company". (The Journal of Disaster Studies, Policy and Management, Volume 24, No 4 pp.385, Oxford , 2000.)

Since late 2001, Dahabshiil has more than doubled money-transfers to Somalia from its international offices in 34 countries worldwide, with 400 branches in total, including 25 branches in the United States of America and 50 in the United Kingdom . Dahabshiil has 36 branches in Somalia and 17 branches in Mogadishu . The services provided by Dahabshiil are highly competitive; the company competes with twenty smaller remittance companies.

As for the future, Dahabshiil is vigorously planning to become a fully-fledged commercial bank. This will, among other services, give clients the option, where correspondent banks exist, to deposit remittances with an international bank for direct transfer to and from the existing Dahabshiil branches in Mogadishu , Hargeisa, Bosaso and Burao

Exhibit D-6

10/22/2004  1/5

000072

::: DAHABSHIIL :::

together with other branches.

**Our Vision.**

Having captured the remittance market in Somalia and become significant player in East Africa such as Djibouti , Kenya , Ethiopia , Eritrea and Sudan . We are thriving to take our company in to new territories where we can truly be the IKEA for Somalia people globally, and also to participate rebuilding all sectors of Somali economy.

**Our Mission**

To make Dahabshill remittances arm the true regional leader by bridging the Somalis in Diasporas and those at Home at most reasonable price through its Islamic Banking venture for the development of the country by financing industrial projects, infrastructure related projects.

© Copyright 2003 DAHABSHIIL. All rights reserved.

Page 1 of 1

000073

::: DAHABSHIIL :::




Fast & Reliable
DAHABSHIIL

About Us | Press Release | Careers | FAQs | Administrator

Clients



**Dahabshiil's banking clients include:**

1. United Nations organizations such as UNDP, UNOPS, UNHCR, UNICEF, WHO, UNCHS (Habitat),

2. Some International and local NGOs, the Somali Diaspora, BBC

3. Somalis in Somalia who remit and receive funds.

© Copyright 2003 DAHABSHIIL. All rights reserved.

10/22/2004

http://www.dahabshiil.com/new/clients.asp

000074

::: DAHABSHIIL :::









About Us | Press Release | Careers | FAQs | Administrator

## Due Diligence Policy

DAHABSHIIL has always been vigilant to provide its money services activities in accordance with all applicable currency control laws. Following the horrible events of September 11 and the more stringent regulatory regimes that were imposed on financial services subsequently, DAHABSHIIL has aggressively upgraded all of its compliance procedures. The following are few of the steps DAHABSHIIL has taken since 9/11

- Hired well-known, reputable law firms to help all its agents comply with registration, licensing and reporting regulations.
- Trained all of its agents in reporting, compliance and know-your-customer procedures
- Invested in the acquisition of new propriety software that will force agents to follow all reporting requirements without fail, facilitate activity monitoring and auditing, and make tracking and retrieval of sender/recipient records easier.
- Agreed to a United Nations-sponsored auditing and oversight procedure to be conducted by a respected Accounting Firm in the United States.
- In the Unites States Dahabshiil is carefully and diligently following all PATRIOT ACT requirements, including reporting, monitoring, training and auditing procedures.

10/22/2004

Page 2 of 2

000075

::: DAHABSHIIL :::

© Copyright 2003 DAHABSHIIL. All rights reserved.

10/22/2004

http://www.dahabshiil.com/new/duedilipolicy.asp

UNCLASSIFIED//~~FOUO~~

## Personal Representative Review of the Record of Proceedings

I acknowledge that on _2 November_ ~~October~~ 2004 I was provided the opportunity to review the record of proceedings for the Combatant Status Review Tribunal involving ISN #567.

_✓_ I have no comments.

___ My comments are attached.

████████████████
Name

_2 NOV 2004_
Date

████████████████
Signature

ISN #567
Enclosure (5)

UNCLASSIFIED//~~FOUO~~

000076

# Exhibit 2

# UNCLASSIFIED

**Department of Defense**
**Office for the Administrative Review of the Detention of Enemy**
**Combatants at US Naval Base Guantanamo Bay, Cuba**

22 September 2005

TO:        BARRE, MOHAMMED SULAYMON

SUBJECT:   UNCLASSIFIED SUMMARY OF EVIDENCE FOR ADMINISTRATIVE
           REVIEW BOARD IN THE CASE OF BARRE, MOHAMMED SULAYMON

1. An Administrative Review Board will be convened to review your case to determine if your continued detention is necessary.

2. The Administrative Review Board will conduct a comprehensive review of all reasonably available and relevant information regarding your case. At the conclusion of this review the Board will make a recommendation to: (1) release you to your home state; (2) transfer you to your home state, with conditions agreed upon by the United States and your home state; or (3) continue your detention under United States control.

3. The following primary factors favor continued detention:

    a. Connections/Associations

      1. The detainee worked for the Dahabshiil Company in Karachi, Pakistan.

      2. Dahabshiil is closely related to Al-Barakaat, a Somali financial company designated by the U.S. Government as a terrorism finance facilitator. Following Al-Barakaat's designation and shutdown, Dahabshiil took over much of Al-Barakaat's business.

      3. The detainee was identified as a member of the non-governmental organization al Wafa.

      4. The al Wafa organization has been identified as a terrorist organization on the U.S. State Department's Terrorist Exclusion List.

      5. The non-governmental organization al Wafa reportedly was believed to have had connections to Usama Bin Laden and Afghan Mujahidin.

      6. The detainee received a Tablighi Jamiat Visa to Pakistan.

      7. Jama'at Al Tablighi, a Pakistan based Islamic missionary organization that is being used as a cover to mask travel and activities of terrorists, to include members of al Qaida.

    b. Other Relevant Data

      1. The detainee ran an illegal money transfer business out of his home.

# UNCLASSIFIED

DMO Exhibit _1_
Page 1 of 2

000513

# UNCLASSIFIED

**SUBJECT:** **UNCLASSIFIED SUMMARY OF EVIDENCE FOR ADMINISTRATIVE REVIEW BOARD IN THE CASE OF BARRE, MOHAMMED SULAYMON**

2. Some of the detainee's counterparts in the United States did not have licenses. They were operating illegally, also out of their houses. In addition, there was reason to believe that the detainee had contact with people involved in the support network for al Qaida.

3. The detainee lied to obtain his three-month Pakistani Visa.

4. The detainee was captured after the Pakistani authorities had conducted three raids on his home and finally detained him for illegal money transfers.

4. The following primary factors favor release or transfer:

a: The detainee stated he was never involved in an Islamic Militant group or knowingly transferred funds for their cause.

b. The detainee, during his oral CSRT statement, stated that he had no knowledge of al Wafa until he entered prison in Pakistan.

5. You will be afforded a meaningful opportunity to be heard and to present information to the Board; this includes an opportunity to be physically present at the proceeding. The Assisting Military Officer (AMO) will assist you in reviewing all relevant and reasonably available unclassified information regarding your case. The AMO is not an advocate for or against continued detention, nor may the AMO form a confidential relationship with you or represent you in any other matter.

# UNCLASSIFIED

Page 2 of 2
000514

# Exhibit 3

**UNCLASSIFIED** 

(Revised 30 SEP 05)

<u>**Summary of Administrative Review Board Proceedings for ISN 567**</u>

*The Administrative Review Board was called to order.*

*The Designated Military Officer (DMO) was sworn.*

*The Board Reporter was sworn.*

*The Translator was sworn.*

*The Detainee entered the proceedings.*

*The Presiding Officer announced the convening authority and purpose of the Administrative Review Board proceedings.*

*The Administrative Review Board members were sworn.*

*The Assisting Military Officer was sworn.*

*The Presiding Officer asked the Detainee if he wishes to make a statement under oath. (Muslim oath offered).*

*The Detainee accepted taking the (Muslim) oath.*

*The Presiding Officer read the hearing instructions to the Detainee and confirmed that he understood.*

*The Assisting Military Officer presented the Enemy Combatant Notification form, Exhibit EC-A, to the Administrative Review Board.*

*The Assisting Military Officer presented the Enemy Combatant Election Form, Exhibit EC-B, to the Administrative Review Board.*

*The Designated Military Officer presented the Unclassified Summary of Evidence, Exhibit DMO-1, (and DMO-2 to DMO-3, other unclass information) to the Administrative Review Board.*

*The Designated Military Officer stated that a copy of these exhibits had been previously distributed to the Assisting Military Officer and Detainee.*

*The Presiding Officer noted from the Enemy Combatant Election Form that the detainee wanted to respond to each item of information from the Unclassified Summary as it was presented.*

ISN 567
Enclosure (5)
Page 1 of 13

**UNCLASSIFIED**

eas



UNCLASSIFIED **FOUO**

(Revised 30 SEP 05)

*The Designated Military Officer gave a brief description of the contents of the Unclassified Summary of Evidence, Exhibit DMO-1, to the Administrative Review Board.*

**Designated Military Officer:** The detainee worked for the Dahabshiil Company in Karachi, Pakistan.

**Detainee:** Correct, I worked with Dahabshiil and I was their agent Karachi, Pakistan and you know that Dahabshiil Company has many branches in many countries that have a Somalian community; including the United States, the gulf countries, Europe, African countries, Australia, and also Pakistan. The Pakistani branch was one of those offices. All of those offices fall directly under the main department based in Somalia. If work in Dahabshiil formed an accusation, [then] their places would not be open with you in the countries I mentioned before. Dahabshiil has a page on the internet website. You may have enough information that attests its integrity as well. This will prove its distance from terror and some of its customers are international organizations like "Save the Children". The Dahabshiil website is *www.dahabshiil.com* .

**Designated Military Officer:** Dahabshiil is closely related to Al-Barakat, a Somali financial company designated by the United States Government as a terrorism finance facilitator. Following Al-Barakaat's designation and shutdown, Dahabshiil took over much of Al-Barakaat's business.

**Detainee:** I did not know anything about this before. All I know is that Dahabshiil Company is [a] free-lancer or independent company owned by a known businessman and its main office is in Herikesa, Somalia. I received instructions from this office and I did not hear from them...that they have any connection[s] to other organizations, but generally these issues you can discuss with the owner of the company. If this company has any association with companies suspected of terror [then] some of their offices would not be left open and working while some others were closed. This shows something. It shows that it has clean pages.

**Designated Military Officer:** The detainee was identified as a member of the non-governmental organization al Wafa.

**Detainee:** Not true. I was never one day a member of this organization and I did not hear of [it] until entering the jail in Pakistan from a Pakistani interrogator officer. I spoke of this at the first tribunal that this accusation is not true. I requested from them to bring the company director or manager that is detained here by you [so] he could testify [to] the truth in front of the tribunal. The reply was that the tribunal president refused this request and is not allowing this person to attend this tribunal. I do not know how you want me to prove to you my innocence from this accusation that was built upon phone numbers found in my phone memorandum. Based upon my job that I worked, I received many phone calls from people I know and from people I do not know. It wasn't necessary or required to me to know all the phone numbers listed in the memorandum. Dahabshiil

ISN 567
Enclosure (5)
Page 2 of 13



UNCLASSIFIED **FOUO**



(Revised 30 SEP 05)

Company is not a secret or underground company. It is on the air directly in the internet and any person who has the company address can contact any agent from the company from any country in the world. You also know that I was arrested from my house where it was my workstation. Also, information sources that were with me were confiscated like the computer, files, and notebooks, which provided all the information about my job and they did not find anything that would show association with the company you mentioned. Just phone numbers in the phone book memorandum. Is this enough to direct an accusation? It's something strange.

Designated Military Officer: The al Wafa organization has been identified as a terrorist organization on the United States' State Department's Terrorist Exclusion list.

Detainee: This has nothing to do with me.

Designated Military Officer: The non-governmental organization al Wafa reportedly was believed to have had connections to Usama Bin Laden and Afghan Mujahidin.

Detainee: This has nothing to do with me. This does not concern me.

Designated Military Officer: The detainee received a Tablighi Jamiat Visa to Pakistan.

Detainee: Like the rest of the Somalians, the wars exited the Somalians from their country, I was looking for any refuge [so] I can live in safety, but I wasn't lucky. I wanted to live in countries where people desire to live, where jobs are available; such as Europe, America, Australia, and the Gulf Countries. Though I had to leave to somewhere so I proceeded toward India and I heard that in Pakistan there was a United Nation office receiving Somalians and giving them immigration passes for a period of time and they could also migrate to other better countries that has better living conditions than Pakistan. The office was the best office in the area so I decided to travel to Pakistan. So, I asked the Somalians who were there how I could go to Pakistan and they told me to go the Pakistani Embassy and tell them that I was going to Pakistan for missionary [work] and they will give you the visa. If you can't find another way because you have a Somalian passport and they don't have a country. I did what they told me and I entered Pakistan and later [went] to the United Nation office. It's worth mention[ing] that this type of visa is known by the Pakistani government. It's not against the law and I have taken this type of Visa before, more than ten years ago.

Designated Military Officer: Jama'at Al Tablighi, a Pakistan based Islamic missionary organization that is being used as a cover to mask travel and activities of terrorists, to include members of al Qaida.

Detainee: I do not have any knowledge of these things.

Designated Military Officer: The detainee ran an illegal money transfer business out of his home.

ISN 567
Enclosure (5)
Page 3 of 13





**UNCLASSIFIED/FOUO**

(Revised 30 SEP 05)

**Detainee:** The business job I worked in was very small and there were no licenses for this kind of business within the Pakistani government and this job of mine was in the middle of the Somalian residents living in Pakistan.

**Designated Military Officer:** Some of the detainee's counterparts in the United States did not have licenses. They were operating illegally, also out of their houses. In addition, there was reason to believe that the detainee had contact with people involved in the support network for al Qaida.

**Detainee:** If there are people violating the law of the United States [you] have to take all the appropriate measures, but what I know is that Dahabshiil company has many locations/places in the United States and they have permission [to] work out in the open. You are saying that I have connection[s] with the terrorist, so what is the reason [or] cause? It would be clear to [you] everything about my personal matter and I worked with the Dahabshiil just like the rest of the employees that worked with them. So where is the terror and where is my connection with them? Terror is what departed me from my country and I am one of the people who hates terror most.

**Designated Military Officer:** The detainee lied to obtain his three-month Pakistani visa.

**Detainee:** This point is connected to number six and I did not do this, but the necessity of basic human needs and you know that many refugees that entered [the] United States, they entered illegally, but due to their special situation, [the] United States and other countries received them. Today they prosper with official residential documentation or even received the citizenship.

**Designated Military Officer:** The detainee was captured after the Pakistani authorities had conducted three raids on his home and finally detained him for illegal money transfer.

**Detainee:** These weren't raids. They were just routine visits by the special police and the Intelligence. They wanted to check my identification and my papers. These visits repeated three times, somewhat distant from each other. They took pictures or copies of my immigration paper/pass from the United Nation and after a time period, they came to my house and arrested me. [They] told me they wanted to check some matters and [that] I would be released soon. After four months, they handed me over to the United States Forces.

**Designated Military Officer:** The following primary factors favor release or transfer. The detainee stated he was never involved in an Islamic Militant group or knowingly transferred funds for their cause.

**Detainee:** I have never knowingly or not knowingly transferred funds to anyone. I only received money for the poor Somalian people.

ISN 567
Enclosure (5)
Page 4 of 13



**UNCLASSIFIED/FOUO**



UNCLASSIFIED/FOUO

(Revised 30 SEP 05)

Designated Military Officer: The detainee, during his oral Combatant Status Review Tribunal statement, stated that he had no knowledge of al Wafa until he entered prison in Pakistan.

Detainee: Correct statement. The first time I heard of it is from the Pakistani officer.

*The Designated Military Officer confirmed that he had no further unclassified information and requested a closed session to present classified information relevant to the disposition of the Detainee.*

*The Presiding Officer acknowledged the request.*

*The Presiding Officer opened the Administrative Review Board to the Detainee to present information with the assistance of the Assisting Military Officer.*

Detainee: Based on what was mentioned before and my innocence from these accusations, I do not deserve to stay detained [for] all this time. A lot of interrogators said to me that through this war that was lead by the United States, a lot of mistakes were made and they must be corrected. They told me many times [that] I am here by mistake. I think you came here to correct these mistakes and I have cooperated with the interrogators during all this time and I did not refuse to talk like many detainees who were frustrated from the long interrogation. I was always telling the truth. Like I told [you] before that I left my country because of civil wars and I would like to live in a safe place...with my family making a living.

Presiding Officer: Does this conclude your statement?

Detainee: Yes.

*The Assisting Military Officer stated that he had no additional comments.*

*The Assisting Military Officer had no further questions for the Detainee.*

*The Designated Military Officer had no further questions for the Detainee.*

*Administrative Review Board Member's questions:*

Board Member: the Company that you worked for, did you ever inquire into what the purpose of the money was going to be?

Detainee: No.

Board Member: Did you just give money to people who asked for it without a purpose?

ISN 567
Enclosure (5)
Page 5 of 13



UNCLASSIFIED/FOUO



UNCLASSIFIED/FOUO

(Revised 30 SEP 05)

Detainee: Like I mentioned before, the office was open to the Somalian community who were living there. They would receive money from their relatives or family to help them live there.

Board Member: Did you ever provide money to anybody that was outside the Somalian community?

Detainee: Very, very rarely because it has an internet site and was very well known. Sometimes the college students who were there, a few Somalian or Pakistani students. Those cases.

Board Member: You compared the company you work for with the "Save the Children" organization. Was this just a humanitarian aid? Is that what they provided?

Detainee: It was not [a] comparison. In the tribunal, my personal representative went on the internet and printed out the website and some of the customers of the Dahabshiil Company were "Save the Children". That was an example of the customers of that company.

Board Member: When your home was raided you said that they were checking your identification and your papers. When they came back again did you suspect that they thought you were doing something illegal?

Detainee: I suspected them, but then if I knew I was [going to] get arrested I would [have left] the place, but because it was a company [where] money was transferred I thought maybe it was a routine for them to come and check. Otherwise, if I knew I was going to get arrested I would have left.

Board Member: Do you speak English?

Detainee: A little bit.

Board Member: Did you learn English in Somalia?

Detainee: Yes.

Board Member: This was a hawalai that you had?

Detainee: It was a money transfer.

Board Member: How old are you?

Detainee: I was born at the end of 1965.

Board Member: Did you receive any education in Somalia?

ISN 567
Enclosure (5)
Page 6 of 13



UNCLASSIFIED/FOUO



UNCLASSIFIED/FOUO

(Revised 30 SEP 05)

Detainee: Yes.

Board Member: What education level did you reach?

Detainee: A Bachelors Degree in Agriculture.

Board Member: Did you work with this banking institution in Somalia?

Detainee: No.

Board Member: You are familiar with the process of transferring funds. Were you familiar with that in Somalia? Is it very commonly used there?

Detainee: After the government of Somalia fell, then I had to look for some other way to make a living, a clean way to make a living. This was not my major; it was not my specialty. I had to find a clean way to make a living.

Board Member: Where did you go after Somalia? Pakistan?

Detainee: No, I went to India.

Board Member: Then you went to Pakistan after India?

Detainee: Yes.

Board Member: You had mentioned that you had a traveled on a visa ten years prior to when you went to Pakistan. Where did you travel to at that point?

Detainee: I took it from the Pakistani Embassy in India.

Board Member: How long were you in Pakistan?

Detainee: I have been here since 2005 and my movement was 1994 to India and Pakistan.

Board Member: This business was operated out of your home?

Detainee: Yes.

Board Member: Did you generally have the same customers that came for money transfers?

Detainee: Yes. The office usually opened in a Somalian community. There was a small Somalian community there in Pakistan where that office opened for their needs to go there to have their family send them money and so on. It was in a community where the Somalians were living.

ISN 567
Enclosure (5)
Page 7 of 13



UNCLASSIFIED/FOUO

UNCLASSIFIED                    (Revised 30 SEP 05)

**Board Member:** It was out of your home, is that correct?

**Detainee:** My workstation?

**Board Member:** Yes.

**Detainee:** Yes, my house.

**Board Member:** When there was a transfer, did they come to your house or would they contact you by phone?

**Detainee:** Sometimes they had my phone number they would call me then they would come or they would call me and I would meet them and we would make sure there was no problem.

**Board Member:** What bank did you use to keep the funds?

**Detainee:** I did not work with banks. The money was in my house.

**Board Member:** Did you do any large financial transactions? What was the largest financial transaction?

**Detainee:** It was usually receiving money. The most I remember was about $20,000.

**Board Member:** Pakistani rupees or US dollars?

**Detainee:** American dollars.

**Board Member:** You kept that much money in your house at one time?

**Detainee:** It never stayed there for a long time. I would get faxed from the company the amount of money and the customers would get the information and would come to me and [say] this is the amount of money I am receiving.

**Board Member:** Did you do any swaps? Did you exchange money for anything other than money?

**Detainee:** No.

**Board Member:** You were in Pakistan in 1994, you're educated, and you are obviously very smart. Did you see what was going on in Pakistan?

**Detainee:** I use to hear it on the news just like I heard the news about the wars in my country that I left.

**Board Member:** Did you know about Usama Bin Laden?

ISN 567
Enclosure (5)
Page 8 of 13

20647                    UNCLASSIFIED



UNCLASSIFIED//FOUO

(Revised 30 SEP 05)

**Detainee:** I haven't seen the Taliban. I have never entered Afghanistan. The whole world heard the news that [was] broadcasting. The only information that I have, I was getting from the news that I was watching.

**Board Member:** Did you know about al Qaida?

**Detainee:** I didn't know anything. Sometimes [it was] on the news.

**Board Member:** Were you ever suspicious about the money transfers that you had?

**Detainee:** No, never.

**Board Member:** Were you ever suspicious about any of the sums of money that you transferred?

**Detainee:** No. Not one thing was susp[icious]. The money that came to me was [a] very small amount, very simple money for the Somalians that was receiving [it]. I never suspected because it was [a] very small amount of money.

**Board Member:** I want to make sure that never once were you ever suspicious about any transfer?

**Detainee:** I had someone call me a Somalian and came to me and said [they] want to transfer money... I didn't have any orders from my company, any procedures that I had to check to suspect anything. I didn't have that.

**Board Member:** No paper trail. You never kept records.

**Detainee:** Records how?

**Board Member:** Of transfers?

**Detainee:** There were records of the fax. The faxes said the time and date, the amount of money which company was sent, the address where it went. The other persons on the other side receiving it had to keep the same records.

**Board Member:** Were all of your transfers from Somalia?

**Detainee:** The main department or orders came from Somalia. There was no direct connection to me and other offices in the rest of the world. My orders came directly [from] the main department in Somalia.

**Board Member:** All of your transfers went to Somalians?

**Detainee:** Yes, that is how it was.

ISN 567
Enclosure (5)
Page 9 of 13

UNCLASSIFIED//FOUO



UNCLASSIFIED//FOUO

(Revised 30 SEP 05)

**Board Member:** How did they know about your business? By word of mouth?

**Detainee:** Like I said, my address, my name, my phone number, everything was on the website. Everything was there for people to see.

**Board Member:** Were you making a good living?

**Detainee:** It wasn't what you think [of] a way of living, because the customers, the people I work with were very, very few. [There] were very few transfers. My situation kind of forced me to work this kind of job.

**Board Member:** How many transfers were there a day or a month or a week or a year?

**Detainee:** I've been here four years, but if you want the information, all the files everything I have, the computer, the phone books were taken from me. You have it. You can go back and get them.

**Presiding Officer:** We're just asking for a rough estimate of how many transfers you did on a daily or weekly basis.

**Detainee:** It was not a money transfer. It was to receive. It was not a transfer. In the beginning sometimes this would go and I would not even have one person [then] later day by day I would see one person a day and later on they got more; maybe two people a day. The day that I was detained I have about four to five people, but they were receiving a very small amount of money.

**Board Member:** I would like to talk about Jama'at Al Tablighi. Were you a member or a missionary or a part of Jama'at Al Tablighi?

**Detainee:** No.

**Board Member:** You just used that to get your visa?

**Detainee:** When I went to the Embassy and they gave me the visa and the place where it says purpose of the visa I put missionary. I didn't know anything about Tablighi or anything. They looked at it and said missionary, okay.

**Board Member:** Did you ever visit the Jama'at Al Tablighi center in Lahore, Pakistan?

**Detainee:** I've heard, but have never gone there.

**Board Member:** Were you a member of any NGO, non-governmental organization?

**Detainee:** Never.

**Board Member:** Did you ever give any alms to any organization?

ISN 567
Enclosure (5)
Page 10 of 13



UNCLASSIFIED//FOUO

UNCLASSIFIED/FOUO    (Revised 30 SEP 05)

**Detainee:** Never.

**Board Member:** Did you ever travel with any organization?

**Detainee:** Never.

**Board Member:** Did you know anybody who was a member of these organizations?

**Detainee:** I do not know.

**Board Member:** So you don't know if you transferred any money between these organizations?

**Detainee:** Like I mentioned before, this was a receiving office. It was not to transfer, but if someone came and told me they want to transfer, they usually mention the name of the person. They don't mention...the name of the organization.

**Board Member:** You didn't know all of your customers?

**Detainee:** Not personal[ly].

**Board Member:** You don't know if somebody came to you who might have been a member of al Qaida, al Wafa, or Jama'at Al Tablighi, or another organization. You wouldn't know if they came to you?

**Detainee:** Like I said, the first time I heard of that was here. Let's say for example a person goes to the bank and wants to transfer some money somewhere else, of course you are not going to know that person. That person could be [a] bad person, you would not know what kind of person he is.

**Board Member:** Hawalals are all over, is that right?

**Detainee:** In the places where there was a Somalian community and Somalian people.

**Board Member:** Why did they come to you? Why were you arrested?

**Detainee:** I do not know. You are directing this question at the wrong person. I do not know why I was arrested. When they came to me they arrested me (I was arrested for four months before I was turned over to American forces), they told me I had phone numbers in my booklet that [belong to] bad people and they wanted to be sure what happened and then [that] I would be released.

**Board Member:** Did you have problems with the police, Pakistan, Somalia? Did you have any problems with anyone prior to this?

**Detainee:** Never. Nope I did not.

ISN 567
Enclosure (5)
Page 11 of 13

UNCLASSIFIED/FOUO


UNCLASSIFIED//

(Revised 30 SEP 05)

**Presiding Officer:** I am convinced that your branch of the Dahabshiil Company was used to transfer money for terrorism.

**Detainee:** How? What is your evidence?

**Presiding Officer:** I believe that your company was used in that way. My question is did you know it or not? That is what we are trying to answer today. In the Somali community in Karachi did you ever hear of any support for al Qaida or the Taliban?

**Detainee:** Open your ears very well and hear me out. When I say Somalian community in Pakistan, I don't mean all the Somalis together and they have a leader and they know who is what, doing what. I mean people who are scattered everywhere, the students and the workers who are working all over the place.

**Presiding Officer:** I understand that they are all over the place, but I assume that you lived with and knew any of these people that were Somali and clearly they used you to receive money from different places. Did you hear much about al Qaida or Taliban?

**Detainee:** Never. I did not hear.

**Presiding Officer:** What year did you move to Pakistan?

**Detainee:** 1994.

**Presiding Officer:** In those nine years you were there before you were picked up by the Pakistani police you didn't hear much at all about al Qaida or Taliban?

**Detainee:** What do you mean by hear?

**Presiding Officer:** What I am trying to find out is if you think maybe there were some people that were using your company and using your branch to transfer money or whether you were just totally not paying attention to who they were or if you knew that perhaps some of these people were using your company to transfer money for al Qaida.

**Detainee:** Like I said before, the office was open to students. I do not know what was in people's hearts when they came to me. They came to me and asked did they receive this money yet. My job was only to tell them yes it is here or it is not here.

**Presiding Officer:** You never heard of al Wafa?

**Detainee:** I've mentioned it before I heard if from the Pakistani interrogator officer when I first entered the jail there.

**Presiding Officer:** Where if we decide to release you or transfer you, do you want to go back to Pakistan or go back to Somalia?

ISN 567
Enclosure (5)
Page 12 of 13

UNCLASSIFIED//



**UNCLASSIFIED/FOUO**

(Revised 30 SEP 05)

**Detainee:** Honestly, as you know Pakistan is not my country and every person in their own heart will want to go back to their own country and the only reason I was there was the immigration office. I was there as a refugee. I filed for immigration to go somewhere else, but I would love to go to my country if my country is stable and has a government and is safe to go to. I have been here four years and I don't know any thing [that] has been happening in Somalia right now. If the country is stable and it is okay for me to go there I would rather go to my own country and if my country is not stable I would seek refuge or immigrate to another country that is safe.

**Presiding Officer:** Where is your family?

**Detainee:** My family, I was taken from them in the middle of a very dark night and from that day I don't know [any]thing about my family. They were in Pakistan.

**Presiding Officer:** You haven't heard from them at all?

**Detainee:** My wife's father was arrested. He told me that she has moved in with them. That is the last thing I have heard about my family.

**Presiding Officer:** Why was he arrested?

**Detainee:** He is here. I don't know. He was in his house when he was arrested.

*The Presiding Officer read the post-Administrative Review Board instructions to the Detainee and adjourned the open session of the Administrative Review Board.*

*The Presiding Officer opened the classified portion of the session.*

*The Presiding Officer adjourned the classified portion of the session and the Administrative Review Board was closed for deliberation and voting.*

### AUTHENTICATION

I certify the material contained in this transcript is a true and accurate summary of the testimony given during the proceedings.



Captain, USN
Presiding Officer



**UNCLASSIFIED/FOUO**

ISN 567
Enclosure (5)
Page 13 of 13

# Exhibit 4

# UNCLASSIFIED

**Department of Defense**
**Office for the Administrative Review of the Detention of Enemy**
**Combatants at U.S. Naval Base Guantanamo Bay, Cuba**

4 October 2006

TO:     BARRE, MOHAMMED SOLIMAN

SUBJECT:     UNCLASSIFIED SUMMARY OF EVIDENCE FOR ADMINISTRATIVE
REVIEW BOARD IN THE CASE OF BARRE, MOHAMMED SOLIMAN

1.  An Administrative Review Board will be convened to review your case to determine if your
continued detention is necessary.

2.  The Administrative Review Board will conduct a comprehensive review of all reasonably
available and relevant information regarding your case.  At the conclusion of this review the
Board will make a recommendation to:  (1) release you to your home state; (2) transfer you to
your home state, with conditions agreed upon by the United States and your home state; or (3)
continue your detention under United States control.

3.  The following primary factors favor continued detention:

   a.  Commitment

   The detainee was identified as a Mujahedin in Afghanistan until 1992.

   b.  Training

      1.  The detainee was identified as a member of an institute operated by a senior al Qaida
member in Qandahar that used to be associated with religious and language studies near a
Mujahedin guest house.

      2.  The detainee was identified as a participant of jihadist training in Afghanistan.

   c.  Connections/Associations

   The detainee knew Usama bin Laden personally and, from 1992 to 1995, worked on
Usama bin Laden's compound in Khartoum, Sudan. The detainee worked in the building
occupied by Usama bin Laden's security detachment.

4.  The following primary factors favor release or transfer:

   a.  The detainee stated he never went to Afghanistan.

   b.  The detainee stated he was never involved in an Islamic Militant group or knowingly
transferred funds for their cause.

DMO Exhibit 1
Page 1 of 2

# UNCLASSIFIED

**000659**

ISN 567

# UNCLASSIFIED

**SUBJECT:    UNCLASSIFIED SUMMARY OF EVIDENCE FOR ADMINISTRATIVE REVIEW BOARD IN THE CASE OF BARRE, MOHAMMED SOLIMAN**

    c. The detainee stated he never heard of the al Wafa Organization prior to his arrest by the Pakistani police.

    d. The detainee stated the recipients of the funds he transferred were recorded in his business records on his computer that was seized by authorities.

5. You will be afforded a meaningful opportunity to be heard and to present information to the Board; this includes an opportunity to be physically present at the proceeding. The Assisting Military Officer (AMO) will assist you in reviewing all relevant and reasonably available unclassified information regarding your case. The AMO is not an advocate for or against continued detention, nor may the AMO form a confidential relationship with you or represent you in any other matter.

Page 2 of 2

# UNCLASSIFIED

**000660**

JS-44
(Rev.1/05 DC)

# CIVIL COVER SHEET

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| MOHAMMED SULAYMON BARRE | GEORGE W. BUSH, President of the United States, ROBERT M. GATES, Secretary, United States Department of Defense, REAR ADM. DAVID M. THOMAS, JR., Commander, Joint Task Force - GTMO, ARMY COL. BRUCE VARGO, Commander, Joint Detention Operations Group, Joint Task Force - GTMO |

| (b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _____99999_____ (EXCEPT IN U.S. PLAINTIFF CASES) | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____11001_____ (IN U.S. PLAINTIFF CASES ONLY) NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED |

| (c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) | ATTORNEYS (IF KNOWN) |
|---|---|
| Emilou MacLean<br>CENTER FOR CONSTITUTIONAL RIGHTS<br>666 Broadway, 7th Floor<br>New York, NY 10012<br>Tel: (212) 614-6424<br>Fax: (212) 614-6499 | Terry Marcus Henry<br>U.S. DEPARTMENT OF JUSTICE, CIVIL DIVISION - Room 7144<br>20 Massachusetts Avenue, NW<br>Washington, DC 20530<br>Tel: (202) 514-4107<br>Fax: (202) 616-8470 |

## II. BASIS OF JURISDICTION
(PLACE an x IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff
○ 3 Federal Question (U.S. Government Not a Party)
● 2 U.S. Government Defendant
○ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE an x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and **one** in a corresponding Nature of Suit)

**○ A. Antitrust**

☐ 410 Antitrust

**○ B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

**○ C. Administrative Agency Review**

☐ 151 Medicare Act

Social Security:
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)
Other Statutes
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

**○ D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

---

**○ E. General Civil (Other)**    OR    **○ F. Pro Se General Civil**

Real Property
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

Personal Property
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

Bankruptcy
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

Prisoner Petitions
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

Property Rights
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

Federal Tax Suits
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

Forfeiture/Penalty
☐ 610 Agriculture
☐ 620 Other Food & Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

Other Statutes
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ⊙ **G.** *Habeas Corpus/ 2255* | ⊙ **H.** *Employment Discrimination* | ⊙ **I.** *FOIA/PRIVACY ACT* | ⊙ **J.** *Student Loan* |
|---|---|---|---|
| [X] **530** Habeas Corpus-General<br>[ ] **510** Motion/Vacate Sentence | [ ] **442** Civil Rights-Employment (criteria: race, gender/sex, national origin, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | [ ] **895** Freedom of Information Act<br>[ ] **890** Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | [ ] **152** Recovery of Defaulted Student Loans (excluding veterans) |

| ⊙ **K.** *Labor/ERISA (non-employment)* | ⊙ **L.** *Other Civil Rights (non-employment)* | ⊙ **M.** *Contract* | ⊙ **N.** *Three-Judge Court* |
|---|---|---|---|
| [ ] **710** Fair Labor Standards Act<br>[ ] **720** Labor/Mgmt. Relations<br>[ ] **730** Labor/Mgmt. Reporting & Disclosure Act<br>[ ] **740** Labor Railway Act<br>[ ] **790** Other Labor Litigation<br>[ ] **791** Empl. Ret. Inc. Security Act | [ ] **441** Voting (if not Voting Rights Act)<br>[ ] **443** Housing/Accommodations<br>[ ] **444** Welfare<br>[ ] **440** Other Civil Rights<br>[ ] **445** American w/Disabilities-Employment<br>[ ] **446** Americans w/Disabilities-Other | [ ] **110** Insurance<br>[ ] **120** Marine<br>[ ] **130** Miller Act<br>[ ] **140** Negotiable Instrument<br>[ ] **150** Recovery of Overpayment & Enforcement of Judgment<br>[ ] **153** Recovery of Overpayment of Veteran's Benefits<br>[ ] **160** Stockholder's Suits<br>[ ] **190** Other Contracts<br>[ ] **195** Contract Product Liability<br>[ ] **196** Franchise | [ ] **441** Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**
⊙ **1** Original Proceeding    ○ **2** Removed from State Court    ○ **3** Remanded from Appellate Court    ○ **4** Reinstated or Reopened    ○ **5** Transferred from another district (specify)    ○ **6** Multi district Litigation    ○ **7** Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)
28 U.S.C. §2241: Petition for Writ of Habeas Corpus.

**VII. REQUESTED IN COMPLAINT**    CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23    **DEMAND $**    Check YES only if demanded in complaint
**JURY DEMAND:** YES [ ]  NO [ ]

**VIII. RELATED CASE(S) IF ANY**    (See instruction)    YES [ ]    NO [X]    If yes, please complete related case form.

**DATE** July 26, 2008    **SIGNATURE OF ATTORNEY OF RECORD**

---

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.    CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.    CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.    RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.